**DISTRICT COURT OF THE UNITED STATES**

**FOR THE DISTRICT OF RHODE ISLAND**

**United States Department of Education, et al**

**v.** **CA#07-24ML**

**Christopher M. Alvanas, et al.**

**APPELLEES' MEMORANDUM OF LAW**

**IN OPPOSITION TO THIS APPEAL**

**Travel of the Case:**

The Appellees, Christopher M. Alvanas (hereinafter referred to as "Chris") and Shari A. Alvanas (hereinafter referred to as "Shari") filed a Chapter 7 bankruptcy petition in the US Bankruptcy Court for the District of Rhode Island on or about 10/15/05, just prior to the effective date of the changes in the bankruptcy code. Both of the appellants, US Department of Education (hereinafter referred to as "USDE") and Nelnet, Inc. (College Access Network's predecessor in interest) were listed as creditors, USDE under Schedule E and Nelnet under Schedule F.

The Section 341 meeting was held on 11/9/05 and the Debtors were discharged on 1/10/06. Chris and Shari filed the actions being appealed on 12/22/05 as AP No. 05-1083 and 1084. The Debtors asked that their student loan obligations be discharged as they presented an undue burden on the Debtors and their dependants due to Chris's medical

condition – Machado Josephs Disease (hereinafter referred to as "MJD"), and Shari's employment situation and future need to care for her husband. These matters were consolidated for trial on 7/13/06. That trial was held before Judge Votolato on November 29, 2006. After hearing all of the evidence, which consisted of direct testimony, with cross examination, by Chris and Shari, Chris's treating physician's report read into the record by agreement of the parties (Dr. Brogna was ill that week) and various documents (all listed in Appellants Joint Designation of Record), Judge Votolato issued a bench decision. Based upon the evidence presented, he granted the Debtors' request that their student loan obligations be dischargeable under 11USC 523(a)(8) and so ordered same discharged.

This Appeal was noticed on or about 12/22/06 by both USDE and College Access Network (Nelnet's successor in interest and hereinafter referred to as "CAN".)

**Issues Raised by Appellants:**

The Appellants have asked this Court to re-examine the issue of the Appellee-Debtors' current and future ability to make payments on their student loan obligation to the Appellants and still "maintain a reasonable, minimal standard of living for the plaintiff-debtors and the plaintiff-debtors' dependants…" (Appellants' Joint Statement of Issues to Be Resolved on Appeal, 2/13/07). The Appellants have also asked the question: "Whether the Bankruptcy Court improperly admitted and considered as evidence, lay testimony regarding the medical condition of individuals related to the plaintiff, Christopher Alvanas." (Id.)

**"Lay testimony": The Facts**

Appellees shall respond to the second issue first. During her direct testimony, Shari was asked if she had had the opportunity to observe the progression of care needed by other members of Chris's family who have or had MJD. She indicated that she had so observed. Shari was then asked:" Could you tell the Court what you see as the care that you may need to provide to Chris in the near future? Next five years let's say." Hearing Transcript 11/29/06, pg. 21, Lines 4-6.

At this point, counsel for CAN objected:

> "I object to that question, Your Honor. That's speculative. He's asking the witness what care is being provided to in-laws who may have – who have this disease. They may have a different – they may be in a different stage of the disease or have a different type or level of the disease. So that may not be relevant to what's going to happen in the future with respect to the witness' husband." Tr. Pg. 21, Lines 8-17.

This objection went to the speculative nature and the relevance of the witness' testimony. No where is there an objection raised as to lay testimony, non-experts and/or medical evidence. This is the only objection made during the entire hearing. It was joined by the USDE. Tr. Pg. 22, Lines 2-3.

The Court overruled the objection, stating:

> "And I'm going on the assumption right now that the disease that the debtor has is the same one that seems to run through his family. So I'm going to overrule the objection. Depending on cross examination will have a lot to do with the weight that's given the evidence and also maybe

> it's admissibility also if you're correct about the different stages having no relevance to each other. So I'm going to kind of leave that open, but let it in for now." Tr. Pg. 21-22, Lines 19-1.

The witness continued to testify as to her observations of the people around her who were afflicted with MJD. She never testified as to the type of MJD any specific person had or to any other medical condition of any of Chris's relatives.

Any and all specific questions concerning the types and severity of MJD that were answered by Shari were asked by the Appellants' counsel during their cross examination of her. Tr. Pg. 25-27. It was here that the Court heard any "lay testimony regarding the medical condition of individuals related to the plaintiff, Christopher Alvanas." Appellants' Joint Statement.

Dr. Carlo Brogna, Chris's treating doctor was scheduled to testify. Unfortunately, he came down with a severe case of flu and was unable to appear on the day of the hearing. Under a stipulation agreed to by all parties, Dr. Brogna's written report was read into the record in substitution for his testimony. Tr. Pg. 61-63. After the report was read into the record, counsel for CAN asked that a portion of the attachments to Dr. Brogna's report also be read into the record. Tr. Pg. 63-64. This section discussed the different types of MJD in regard to age of onset and range of symptoms. All parties and the Court agreed that this information was necessary for the Court to consider, in light of the earlier objection by CAN's counsel. The additional information was read into the record. Tr. Pg. 64, Lin 9 to Pg. 65, Line 3.

Finally, Chris took the stand and was asked on direct examination to give the Court his observations of the effects of MJD on his relatives. Tr. Pg. 81-90. There were no objections by counsel for either Appellant. He also testified as to the effects of MJD on him. TR. Pg. 81-90.

**The Decision:**

In its bench decision, the Court immediately took note of the fact that Dr. Brogna did not testify in person and was not available for cross examination by the Appellants counsel. "I think that Mr. Alvanas' case is pretty much a no-brainer and, you know, I don't know if it would have been different if his doctor had to come in and be cross-examined." Tr. Pg. 153, Lines 8-11.

The only time in its bench decision that the Court alludes to the "medical condition of individuals related to the plaintiff" is at TR. Pg. 156 where Judge Votolato states:

> "The anecdotal evidence about Christopher's father and his uncle and I guess an aunt and a cousin, it all just supports the situation he's in which is really unfortunate but there it is and he is, I think, dealing as well as he can with it."

That is a one paragraph reference by the Court to the lay testimony at issue, in a seven page decision.

**Argument:**

The question is did the Court improperly admit and consider lay testimony regarding the medical condition of Chris' relatives. The easy answer is NO. The disputed

testimony was offered and given as opinion testimony by lay witnesses and is admissible under the Federal Rules of Evidence. Rule 701 states that a witness is not testifying as an expert if her opinions are "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony..., and (3) not based on ... specialized knowledge within the scope of Rule 702." The testimony of Shari (which was the only lay testimony objected to by the Appellant) was based upon her perceptions of what she observed concerning her relatives with the same basic disease as her husband. The word perception, as used in Rule 701, refers to "awareness of one's environment through physical sensation", or "the ability to understand." Merriam Webster Dictionary, 1994 Ed. Shari was never asked on direct to quantify or identify a subset of her husband's disease, as she was under cross-examination.

Appellees argue that the lay testimony about which the Appellants complain was admissible as "opinion testimony of a lay witness" under Rule 701. The Appellants' original and only objection to this testimony (Tr. Pg. 21) was based on relevance. They Appellants never specified the reasons for their inadmissibility objection. Appellants were afforded the opportunity by the Court to raise this issue again, after Dr. Brogna's report and addendum were read into the record (Tr. Pg. 21-22). They also had the opportunity to raise and clarify the issue after the Court's bench decision. Neither counsel took either opportunity to do so.

If the Court were to agree with the Appellants that the subject testimony was inadmissible, then it is argued that such admission was harmless error. One reason is that any possible damage from the subject testimony was repaired by Appellant CAN's counsel on cross-examination. He referred the witness to the four types of MJD and

asked about them. She was unable to correctly identify them, but was able to state the general basis for the differences. Tr. Pg. 25-26.

Further, there is no evidence that the Bankruptcy Court gave the "anecdotal evidence" of other's medical conditions more than passing consideration in its decision-making process. The Bankruptcy Court stated that this case was "...pretty much of a no-brainer..." and that "...the 800 pound gorilla in Mr. Alvanas' case is basically his physical condition." Tr. Pg. 153, Lines 8-9 and 23-24. It was not until near the end of his decision (Tr. Pg. 156), after he had announced the result and the basis for it, that there was any reference to the subject testimony.

**Lay Testimony – Conclusion:**

The testimony about which Appellants complain is not expert testimony parading as lay testimony. It is not an expert witness posing as a lay witness. It is the opinion testimony of a lay witness that comes from her observations (perception) of the people around her (her environment). It was helpful to the Court for "... a clear understanding of..." her testimony. Rule 701. It was not based upon any specialized knowledge, except that accrued by living with her husband and his condition for more than ten years. It was fully admissible and relevant to the matter at hand.

In the alternative, if such testimony is inadmissible, the admission of same was harmless error. The Bankruptcy Court would have rendered the same decision with or without the "improperly admitted ...evidence", because the existence of Chris' MJD was, in and of itself, "... the 800 pound gorilla..." in this case, which made the Bankruptcy

Court's decision "...a no-brainer...". There is no evidence that the Bankruptcy Court improperly considered such evidence or gave it more weight than it was worth.

**Reasonable, Minimal Lifestyle: The Standard of Review**

The Appellants raise the following issue: "Whether the plaintiffs-debtors, now, and in the foreseeable future, will be able to maintain a reasonable, minimal standard of living for the plaintiffs-debtors and the plaintiffs-debtors dependants and still be able to make payments on the plaintiffs-debtors student loans." Appellants' Joint Statement.

The Appellants must believe that the facts before the Bankruptcy Court could have been interpreted in ways different than the way the Bankruptcy Court did. This Court should be aware that all of the evidence admitted before the Bankruptcy Court was presented by the Appellees or was produced by the Appellees. There was no contradictory evidence entered by either Appellant, nor no new, direct evidence offered by either Appellant.

This Court has stated numerous times that on appeal from the Bankruptcy Court, the District Court applies a "clearly erroneous" standard of review to findings of fact and a "de novo" standard of review to questions of law. Bankr. R. 8013, Briden v. Foley, 776 F.2d 379, 381 (1st Cir. 1985), In re: First Software Corp., 107 BR 417 (D. Mass. 1989), In re: Mayhew, 223 B.R. 849, 854 (D.R.I. 1998). There should be no deviation from that standard for the Court's review of the matter at hand.

**Findings of Fact:**

The Bankruptcy Court found that Chris's Machado Josephs Disease is "…a serious one. I don't think there's any basis for the Court to think that it's going to either level off or go into remission or get better…" Tr. Pg 154, Lines 1-3. The Bankruptcy Court further stated:

> "But as far as the Court's requirement to look at how that condition impacts on the outcome of this case, that's – it's just there and there's nothing that – I don't think anything has been shown that is going to alleviate that or cause anything that would constitute anything but a hardship if he were required to continue to have to worry about that one." Id, Lines 5-10.

The Bankruptcy Court was not clearly erroneous in accepting this uncontroverted evidence as fact.

The Bankruptcy Court found that Shari's situation, while not as dire as Chris's, was similar. It acknowledged that she has not been able to find constant work in her field ("…she's got herself painted into a pretty narrow—how can I put it – way of earning a living." Id, Lines 13-14.) The Bankruptcy Court found as a fact that Shari is willing to take other types of work, but may not be qualified for them (Id, Lines 14-16) and found that the Appellees "…are even willing to relocate if Mrs. Alvanas could get significant work and income somewhere else. That hasn't happened and I don't think it's because she has her head in the sand or because she hasn't tried." Tr. Pg. 158, Lines 6-9.

The Bankruptcy Court was not clearly erroneous in accepting this uncontroverted evidence as fact.

In regard to the Appellees income and expense testimony and evidence, the Bankruptcy Court found as fact that:

> "There doesn't seem to be much area for dispute. I have to mention that both witnesses are very credible. No reason for the Court to discount what they've told me. There doesn't seem to be much dispute over what the numbers are. The expenses are almost $3,400 a month; the income around $2,300. A thousand dollar a month shortfall is obvious and the fact that – somebody used the expression that the well has run dry as far as outside help or at least it will be running dry. There is no evidence that either debtor's parents are well to do so that this lending program or gifting or whatever it is can go on indefinitely." Tr. Pg. 155, Lines 4-14.

The Bankruptcy Court decided that the facts of this case did not call for staying a decision in either Appellee's case. The Court made reference to a past case where it did postpone a decision for a yearly review, but held here "I believe that the picture doesn't call for postponing matters to see what happens next year…No increase in income is foreseeable. No decrease in expenses is in the wind." Tr. Pg. 156, Lines 13-14 and 17-19.

With their cross-examination of the Appellees, the Appellant's tried to show that the Appellees had some extravagant expenses – bottled water, hair salon visits, Chris staying in a hotel and eating in a restaurant when he was working in Boston, etc. In regard to this testimony the Bankruptcy found:

> "One could quarrel with the fact that Christopher, you know, has a job where he might have to eat out once in a while or stay

overnight maybe three or four times a year. The alternative to that, I don't know that there is one. I don't believe I heard a viable one. I don't think that the case should turn on whether the debtors have bottled water or if there is a hair salon visit every five or six weeks. It's all relative and as I said, every judge's experience and I'll say tolerance for the so-called luxuries is different. I haven't seen any extravagance in this case. I asked the question myself, wondering what there might be out there, but I'm satisfied that very often stuff like that does tip the scales in the\ creditor's favor if it's at all significant but it has to be much richer than what we've seen here for my blood at least." Tr. Pg. 157, Lines 14-25 and Pg. 158, Lines 1-3.

**The Facts Argument:**

As stated before, the facts as presented to the Bankruptcy Court by the Appellees were uncontroverted by the Appellants. The Court had only one set of facts to with which to deal, not two sets of opposing facts out of which to try and parse the truth.

Both Shari and Chris testified that their expenses were $3,392.00 (Shari – Tr. Pg. 18, Lines 7-25; Chris – Tr. Pg. 150, Lines 19-23). The Appellants offered nothing into evidence to dispute that figure. The Bankruptcy Court was not clearly erroneous in accepting this evidence as fact.

Shari testified as to her income and offered mixed figures at different times. But, on cross-examination, the Appellant CAN introduced Shari's payroll statement from the

University of Massachusetts – Dartmouth into evidence (see Exhibit A). Tr. Pg. 37, Lines 3-10. This clearly shows that her monthly take home income at the time of hearing was $1,994.04. She further testified that Chris contributed an average of about $300.00 per month. Tr. Pg. 18, Lines 10-15. Further testimony showed that over the last eleven months, Chris had contributed a total of $5,000.00 to the household bills, or an average of $450.00 per month. Tr. Pg. 79, Lines 6-10. This made a total family income of $2,444.04 per month. The Bankruptcy Court was not clearly erroneous in accepting this evidence as fact.

The facts, as presented by both the Appellants and the Appellees, show that the Alvanas' reasonable monthly expenses are $3,392.00 and that their monthly income is $2,444.04. There is clearly a monthly shortfall of $947.06, not as large as the Bankruptcy Court stated ($1,000.00), but still a significant shortfall.

While the Appellants tried to confuse the issue by using gross income for Shari as opposed to take home pay, and to say that Chris's payment of the health insurance premium was a monthly occurrence, there were no offers of proof and the Appellees evidence was the only income evidence.

In regard to Chris's health, the only evidence offered was Chris's testimony on direct, cross and redirect, and the reading of Dr. Carlo Brogna's medical report into evidence by stipulation of the parties Tr. Pg. 60-65. There was no rebuttal witness or medical evidence offered by the Appellants. The parties agreed early on that Chris suffered from Machado Josephs Disease. The Appellants had concerns about what type Chris had, but offered no medical evidence at all. That Chris has the disease is not an issue here. What its effects are and will be is not an issue here, as the Appellants offered no evidence to

rebut anything that was offered into testimony by the Appellees. The Bankruptcy Court was not clearly erroneous in accepting Chris's medical condition and its likely progression as facts.

There were only one set of facts presented to the Bankruptcy Court, and since it had to find facts upon which to base its decision, the Court reasonably found as fact that which was before it and believable. This Court should follow the standards of Rule 8013 and fully accept the Bankruptcy Court's findings of facts.

**Questions of Law:**

This Court has a "de novo" standard of review for questions of law on an appeal from the Bankruptcy Court. Rule 8013. Further, this Court is free to affirm the Bankruptcy Court's decision on any grounds supported by the record. In re: Erin Food Services, Inc., 980 F.2d 792, 801 (1st Cir. 1992)

The Appellants claim that the Bankruptcy Court was wrong on the law by allowing the Appellee's student loan obligations to be deemed dischargeable under the law. The Bankruptcy Court, after evaluating all of the evidence presented to it determined that "The figures just don't allow for an order, number one, requiring the debtors to continue to pay on either loan. I think we passed the hardship issue without any trouble." Tr. Pg. 155, Lines 15-17. Further, the Bankruptcy Court ruled out an order similar to one it issued In re: Christine Phelan Phelps, _B.R. _, 1999 W.L. 669310 (Bank. D.R.I. 1999), where it required the debtor to return to the Court for a yearly review to see if her situation changed:

"Eventually, I was satisfied that there was no pot of gold at the end of her

rainbow and I think most of, or many of, my colleagues would think that is a pretty Draconian approach that this Court took. The case has no similarity to this one. I believe that the picture doesn't call for postponing matters to see what happens next year." Tr. Pg. 156, Lines 9-14.

**Argument: "Brunner" or "totality of circumstances"**

The Bankruptcy Court did not specifically state that it was addressing all three prongs of the so-called "Brunner Test": 1) based on current income and expenses the debtor cannot maintain a "minimal" standard of living for him/her and dependants, if required to repay the loans; 2) this state of financial affairs is likely to persist for a significant portion of the repayment period; and 3) the debtor has main good faith efforts to repay the loans." Brunner v. New York State Higher Educ. Serv. Corp., 831 F.2d 395, 396 (2nd Cir. 1987) It did address all the points necessary in applying the "totality of the circumstances approach", as it has in the past: "1) an analysis of the debtor's past, present, and reasonably reliable future financial resources; 2) calculation of the debtor's and his dependant's reasonable necessary living expenses; and 3) any other relevant facts and circumstances surrounding that particular bankruptcy case." Andersen v. Nebraska Student Loan Program, Inc., 232 B.R. 127, 140 (8th Cir. BAP 1999).

Under either hardship standard these debtors are entitled to relief and the Bankruptcy Court, applying the facts before it, made the correct decision.

**"Brunner" – Prong 1 -** The Bankruptcy Court stated that the facts showed that the Debtors had a "one thousand dollar a month shortfall" and that "The figures just don't allow for an order …on either loan. I think we have passed the hardship issue without

any trouble." Tr. Pg. 155, Lines 9-10 and 15-17. **Prong 2** - The Court continued: "I believe that the picture doesn't call for postponing matters to see what happens next year...No increase in income is foreseeable. No decrease in expenses is in the wind." Tr. Pg. 156, Lines 13-14 and 17-19. **Prong 3** – Both Appellants offered into evidence the payment histories of both debtors in regard to their respective loans. These histories (please see attach B and C) show that both Appellees made good faith efforts to repay their student loan obligation prior to filing for bankruptcy in October, 2005.

**Totality: Prong 1** – The Bankruptcy Court heard and considered testimony from the Debtors regarding their past financial resources (Tr. Pg. 157, Lines 8-13), present resources: "A thousand dollar a month shortfall is obvious ..." (Tr. Pg. 155, Lines 4-10) and reliable future resources: " ..the well has run dry as far as outside help..." (Id, Lines 10-14) and "No increase in income is foreseeable. No decrease in expenses is in the wind." (Tr. Pg. 156, Lines 17-19). **Prong 2** – there was undisputed testimony about the Appellees reasonable necessary living expenses (Tr. Pg. 10-18) and the Bankruptcy Court accepted those calculations of "...expenses are almost $3,400 a month..." Tr. Pg. 155, Line 8. **Prong 3** – the Court took into consideration the testimony of Shari concerning her teaching position and her inability to secure a tenured position (Tr. Pg. 154, Lines 11-25 and Pg. 155, Lines 1-3. The Bankruptcy Court also considered Chris's employment options and concluded that no change there offers a satisfactory result. Tr. Pg. 156, Lines 23-25, Pg. 157, Line 1-7. Finally, the Court considered the Appellees' willingness to move if Shari could obtain better employment elsewhere (Tr. Pg. 158, Line 5-14) and the fact that Chris would rather work than get receive government assistance. Id, Lines 15-21.

**Conclusion: Findings of Fact**

There is no evidence in the record that even suggests, let alone supports, any argument that the Bankruptcy Court's findings of fact were clearly erroneous. All of the income and expenses evidence that the Court had before it was from the testimony of Chris and Shari and from their records. The Appellants offered no independent evidence and no contradictory testimony. All of the evidence before the Court on the issue of Chris's medical condition came from Chris, Shari and the written report of Chris's doctor, Dr. Brogna. There was no contradictory medical testimony from Appellants, no evidence to suggest that MJD is not hereditary, debilitating and progressive. This Court must accept the findings of fact of the Bankruptcy Court as it makes it decision in this appeal.

**Question of Law**

The question of law is no more difficult for this Court to decide. The threshold question under both the Brunner and the "totality" tests is: Can the debtor pay his basic living expenses and make payments on his/her student loan obligations and not be placed under an undue hardship? These debtors cannot possibly do this. The Bankruptcy Court called the decision a "no brainer". There is "a thousand dollar a month shortfall" between their joint incomes and their necessary, reasonable expenses. The Bankruptcy Court found no "extravagances in this case". Even if it were to order that the debtors not purchase bottled water, Shari not go to the hairdresser every other month and Chris not to eat in a regular restaurant or stay overnight when he is teaching, these savings would be insufficient to affect the existing shortfall and still wouldn't allow for an order of payment. The Bankruptcy Court understood this.

What other "relevant facts and circumstances surrounding" this particular bankruptcy case can this Court consider? "...(T)he 800 pound gorilla in Mr. Alvanas' case is basically his physical condition." The Bankruptcy Court was satisfied that Chris's MJD was serious and wasn't going to "...level off, go into remission or get better...". Another consideration was Shari's employment predicament. She wasn't qualified enough for a tenured position in a college (hadn't been published enough), but was over qualified for many jobs outside her field. The final insult is that even with a master's degree, she cannot teach high school English, because she does not have a teaching certificate. The Bankruptcy Court correctly took all of these "surrounding circumstances" into consideration when it made its decision that there would be undue hardship on the debtors if they had to repay their respective student loan obligations.

The Appellees state that there was no error in the Bankruptcy Court's decision in this matter. The Bankruptcy Court did not err when it allowed Shari to testify about her observations and lay opinions about the medical condition of Chris's relatives who also suffered from MJD. If this Court finds that there was an error, it was a harmless error, as the decision of the Bankruptcy Court did not turn on such testimony.

The Bankruptcy Court's findings of fact were not "clearly erroneous". This could be a question if there had been any contradictory evidence presented by the Appellants, but there was no evidence generated or offered by the Appellants in this case. The Bankruptcy Court ruled upon the evidence before it and the Appellants can not come before this Court and now complain that that Court did not have all the facts. They offered no witnesses, no contradictory evidence, nothing to sway the Bankruptcy Court to decide in their favor.

The Appellees state that the Bankruptcy Court properly applied its finding of facts to the law and arrived at the correct decision, if not the only decision available to it. Under either test, "Brunner" or the "totality of circumstances", the facts support relief for the Debtors. If a debtor (Shari and Chris) is unable to always pay his/her rent, his/her auto insurance, his/her health insurance and must rely on the kindness of family to survive, there can be no question that the additional cost of an order for any amount of student loan repayment would be an undue hardship on the debtors and their dependants. If a debtor (Chris) has a medical condition that the evidence shows is only going to get worse, that the debtor is going to be able to do less income-producing work in the future, not more, it is a fact that the debtor does not have "reasonable future financial resources" and that "this state of financial affairs is likely to persist for a significant portion of the repayment period." If a debtor (Shari) has seriously tried to find work outside of the state, outside of her specialty and even outside of her field, and hasn't been successful, and has to deal with the effects of a spouse's serious illness, these are "relevant facts circumstances surrounding that particular bankruptcy case".

For all of the above reasons, this Court must re-affirm the holding of the Bankruptcy Court that the debtors and their dependants would be under an undue hardship should an order to repay their student loan obligations be entered.

Respectfully submitted,
**Christopher M Alvanas and Shari A. Alvanas**
by their attorney

______________________________
Thomas B. Orr, Esq. #2851

**Transcript Pages and Exhibits referenced in Memorandum:**

21
22
25-27
60-65
81-90
153-158
18
150
Ex. A
37
79
Ex. B
Ex. C
10-18

Q And have you observed during your marriage that the progression of the care that is needed by your in-laws?
A Yes.
Q Could you tell the Court what you see as the care that you may need to provide to Chris in the near future? Next five years let's say.
A Well, --

MR. SEEDORF: I object to that question, Your Honor. That's speculative. He's asking the witness what care is being provided to in-laws who may have -- who have this disease. They may have a different -- they may be in a different stage of the disease or have a different type or level of the disease. So that may not be relevant to what's going to happen in the future with respect to the witness' husband.

THE COURT: I just was able to get a quick look at the doctor's report which I understand is going to be part of the evidence?

MR. ORR: Yes, Your Honor.

THE COURT: And I'm going on the assumption right now that the disease that the debtor has is the same one that seems to run through his family. So I'm going to overrule the objection. Depending on cross examination will have a lot to do with the weight that's given the evidence and also maybe it's admissibility also if you're correct about the different stages having no relevance to each other. So I'm going to kind

of leave that open, but let it in for now.

MR. IONNATTI: Just for the record, Your Honor, I would join the objection.

THE COURT: Certainly.

MR. ORR: Thank you, Your Honor.

BY MR. ORR:

Q Sheri, how long have you and Chris been married?

A Twenty-six years.

Q And do you know how long his father has had observable or how long you've observed his father's Machado Joseph disease?

A Probably he may have been in his late 30's, early 40's.

Q Who, Chris or his father?

A His father.

Q And how old is he now?

A Sixty-nine.

Q So you've personally known since he was probably 50, correct?

A Um-hum.

Q And how have you seen the progression that you've observed of the disease through his father?

A He had to move out of the trailer that he was renting. And when he was around 50 --

THE COURT: Would you try to keep your voice up a little bit please?

A Sure.

A Yes.

MR. ORR: I have no further questions, Your Honor, of this witness.

CROSS EXAMINATION

BY MR. SEEDORF:

Q Ms. Alvanas, my name is Kyle Seedorf. I don't believe we've met.

A No.

Q But I represent the College Access Network. As you may be familiar we are the guarantors of the loans that your husband is here today seeking to discharge in his adversary proceeding. You understand that?

A Yes.

Q I just wanted to follow up on a couple of the questions that you were asked by Mr. Orr. You mentioned that Chris' uncle and his father have the same diagnosis as Chris, is that correct?

A Yes.

Q And do you know what type?

A I don't know. I know that there is Type 1, 2, and 3, but I know that it's a hereditary disease. Because Chris has it my two kids have a 50/50 chance of having it. I know that the intensity increases each generation. I don't know what type they are.

Q Do you understand that the type designation of Type 1,

Type 2, Type 3 also is determined by the severity of the of MJD?

A Yes. It's my understanding that it, and I can be wrong, that the types have more to do with the age onset. That Type 1 would have a 40 year old age onset. Type 2 might have 30 year old age onset. That's my understanding.

Q Okay. So you're not really familiar with what the types are exactly or how they're determined?

A No, not exactly.

Q And you don't know which type Chris' uncle or father have?

A I don't.

THE COURT: I assume, counselor, that your question is tied in with some knowledge that you have that we'll hear about?

MR. SEEDORF: You will, Your Honor. It's going to be part of what's going to be read in as my understanding from Mr. Orr.

Q So when you say that your assumption is that Chris will be forced to use a wheelchair at some point in the future?

A That's my assumption. I only can base that on his father.

Q Okay. So that's just based on what you've observed from two people who have this disorder in his family.

A Well, there's more than two. He has an aunt that passed away about 20 years ago and a cousin his age that just passed away about three or four months ago.

Q And were either of them using a wheelchair?
A Yes.
Q Both of them?
A Both of them.
Q Okay. So it's based on your observations from four people?
A Yes.
Q Okay. When you reference borrowing from Chris's sister and I believe also from your parents $2500 from your parents and $5000 from his sister --
A Yes.
Q -- I believe you used the term borrowed, is that correct?
A Yes.
Q So were those loans they were expecting you to repay?
A They're loans that I hope to repay.
Q Do they view them as gifts?
A I don't know. They offered and we accepted and we accepted under the condition that we would hopefully be able to repay those.
Q Have they asked you to make any payment back on them?
A No.
Q You referenced, I believe, if you could turn to Tab B in plaintiff's exhibits. I think that's the one that you were looking at with Mr. Orr.
A This one?

MR. SEEDORF: Thank you, Your Honor.

MR. ORR: Thank you, Your Honor.

THE COURT: Let's take a five minute break.

(Break)

THE COURT: Okay, back in the matter of Christopher and Sheri Alvanas. It's now twenty after. I apologize for my miscalculation on when we'd get started again. And I will have to be leaving. This is going to be a real short session to begin with. I'll be leaving around twenty minutes to two. But the good news is that I may be able to sneak out early from my other commitment so that if you could be available by cell phone if I get out early I'll be able to track you down unless you're going to stay here. It's up to you.

MR. ORR: We'll be here.

THE COURT: Okay.

MR. SEEDORF: Well, Your Honor, with only half an hour. Maybe that will be time to read the doctor's report into the record. I think that would be better than starting with --

MR. ORR: I think that would be helpful even before Chris' testimony.

THE COURT: Sure. Okay. I'll take your judgment on that.

MR. ORR: This is the first two pages, Your Honor, of Exhibit A, plaintiff's Exhibit A. Headline Coastal Neurology, Carlo G. Brogna. The third page is his CV, Your Honor, which I

don't believe there's any questions about regarding that from the defendants. The report is dated September 13th 2006, addressed to myself.

"Dear Attorney Orr, I'm writing today in behalf of my patient Mr. Christopher Alvanas" --

THE COURT: Let me ask you, I can tell you that I just finished reading this report so I have it in my mind this is going to be a full exhibit. If you want it in the transcript that's fine, but if you think that's not necessary, again, your choice.

MR. ORR: In case there's an appeal, Your Honor, I think it might be beneficial to have it in the transcript.

THE COURT: Go ahead.

MR. ORR: "I'm writing today on behalf of my patient Mr. Christopher Alvanas concerning his diagnosis of Machado Joseph disease. Mr. Alvanas is a 44 year old man who I initially saw almost four years ago because of subtle gait and balance changes. At that time I diagnosed early changes of central ataxia which had probably started five years before. Mr. Alvanas has a positive family history for Machado Joseph disease which I am personally aware of as I first diagnosed his paternal uncle 15 years ago, then Chris' father, and I continue to treat them. "Chris' diagnosis was confirmed by genetic testing performed on November 6th 2002," which the report of is the last page of Exhibit A.

"Over the past four years Chris' condition has progressed. His principal manifestations of MJD are 1) gait ataxia. This refers to impairment of his ability to walk and stand due to poor balance. He presently uses a cane at all times and has to walk with is feet slightly spread apart as he is unsteady. He is still independent using the cane to walk, however, his maneuverability is significantly impaired. For example, on sidewalk or on any type environment he needs to be extremely careful as he is unsteady and may veer off to either side and if not careful, particularly on uneven surfaces could fall.

"2) over the past two years he has been having increasing difficulty with arm, hand and finger motility. MJD affects coordination, not only of walking, but also of arm and hand movements. Chris now has the start of the same type of unsteadiness characteristic of his gait in his arm called dysmetria. For example, in reaching for objects there is side to side wavering that makes fine motor manipulations difficult. Also, in his day to day functioning he has found it pretty much impossible at this point to manipulate his cameras and other equipment to be able to function as a professional photographer.

"Finally, he's having increasing problems using the computer keyboard and mouse, both necessary for picture and graphic processing. Even simple acts such as cursive writing

and manipulating small objects is increasingly difficult.

"In conclusion, MJD is a progressive, degenerative, neurological disease. Mr. Alvanas' present manifestations of MJD are not expected to improve or stabilize. There will be a slow and steady progression of central nervous involvement manifested by greater physical impairments over time.

"Attached is a handout on MJD from the MJD Association." That's the handout that we've asked the Court to take judicial notice of. "My statements and opinions expressed in this letter are within a reasonable degree of medical certainty. I declare under penalty of law that I have not charged Mr. Alvanas or you as attorney for my time in researching and preparing this information regarding Mr. Alvanas' medical condition."

In the last paragraph it talks about his experience as a witness in arbitration and other cases.

THE COURT: Thank you. Anything else you want to read into the transcript?

MR. ORR: I believe that's all we have agreed could be read in. There are other items in the exhibit which are before the Judge, but I don't believe there's anything else that we've all agreed upon.

MR. SEEDORF: I think, Your Honor, maybe just the section on the types of Machado Joseph disease, because we had discussed earlier that a description of what those types were

would be read in.

THE COURT: Okay. And where does that come from?

MR. SEEDORF: That comes from Page 3 or 5 on the Machado Joseph disease writeup that Dr. Brogna provided. It's got his heading and then it says Machado Joseph disease, symptoms of MJD Page 1 of 5 at Page 3 of 5.

THE COURT: Okay. Do you want to go ahead and do that?

MR. ORR: Yes. It's headed "What are the different types of Machado Joseph disease? The types of MJD are distinguished by the age of onset and the range of symptoms. Type 1 is characterized by onset between ten and 30 years of age, fast progression and severe dystonia and rigidity. Type 2 MJD generally begins between the ages of 20 and 50 years, has an intermediate progression and causes symptoms that include spasisity, continuous uncontrollable muscle contractions, spastic gait, and exaggerated reflex responses. Type 3 MJD patients have an onset between 40 and 70 years of age, relatively slow progression and some muscle twitching, muscle atrophy and unpleasant sensations such as numbness, tingling, cramps, pain in the hands, feet, and limbs.

"Almost all MJD patients experience vision problems including double vision, diplopia, and blurred vision, loss of ability to distinguish color and/or contrast and inability to control eye movements. Some MJD patients also experience

Parkinson's like symptoms such as slowness of movement, rigidity or stiffness of the limbs or trunk, tremor or trembling in the hands and impaired balance and coordination."

THE COURT: Anything else along these lines?

MR. ORR: Not that I'm aware of, sir.

MR. SEEDORF: Nothing, Your Honor. Thank you.

THE COURT: Okay. And is that -- your agreement to admit the report of Dr. Brogna, that's going to be it for -- you're waving any kind of cross examination, I guess?

MR. SEEDORF: The agreement as far as what College Access Network agreed to was that these documents would be submitted as in place of his testimony, that this is what he would have testified to if here today. My understanding is that applies to both examination and cross examination.

MR. ORR: Yes, Judge.

THE COURT: Okay. All right then what happens next with a little bit of time we have left?

MR. ORR: We could start with Mr. Alvanas, Your Honor. We have 15 minutes, I guess.

THE COURT: Sure. Almost 15.

MR. ORR: Okay.

C H R I S T O P H E R A L V A N A S, PLAINTIFF, SWORN

COURT CLERK: State your name please.

THE WITNESS: Christopher Alvanas.

COURT CLERK: Please be seated.

Q Oh, since your father has gotten worse, you're the primary care giver?
A Yes.
Q Now, other members of your family have been diagnosed with MJD?
A My immediate family? My brothers and sisters, you mean?
Q Let's start with that. Yes.
A Not officially. No one has had the blood work.
Q Have any of your extended family been diagnosed officially with the disease?
A Only cousins that were related to my aunt that passed away some time ago. But, again, I don't believe many have been -- have made the leap of having a genetic blood test done. They're going by family history.
Q Are there local people that you had a connection with over the years?
A Well, through MJD, I've attended a number of clinics at Saint Anne's Hospital and Charleton Memorial Hospital that the head neurologist there that specialized in MJD's research and development and typically attracts people from all over the place that want to come and share their stories and they get updates on research and any kind of progress that's being made. So I've had interaction with people from across the country.
Q I guess my reference was to your relatives, your cousins that have some of the symptoms but haven't been genetically

tested. You see them on a regular basis?
A Yes.
Q So your family is relatively local?
A Yes.
Q Your extended family?
A Except for my sister, everybody is local.
Q And where does your sister live?
A She presently is in New Jersey.
Q And how old is she?
A Oh, she is --
Q Is she older or younger than you?
A Younger.
Q Okay. Has she had any symptoms that you know of?
A Well, she has voiced concerns over showing symptoms but she's not sure and is kind of tossing and turning about having the test done.
Q Sheri mentioned that your uncle has also been diagnosed.
A That's correct.
Q And is it your father's brother?
A Yes.
Q And has he had the genetic testing?
A I don't recall. I don't know.
Q But he's being treated by your physician --
A Correct.
Q -- for MJD?

A Yes.
Q Have you been able to observe his progression with him also?
A Yes.
Q And do you take care of his affairs or does he have somebody else?
A No. He has -- he's still married so his wife attends to his affairs.
Q It was also mentioned --
THE COURT: Is he living at home or is he in assisted living?
THE WITNESS: He lives at his house, in his home, yeah.
BY MR. ORR:
Q And how old is he?
A Oh, I think he's probably two years younger than my father so that would make him like 67-ish.
Q And do you know when the symptoms became readily apparent of MJD with your uncle?
A He -- his onset, I want to say, is probably maybe, from what I've witnessed, two years after my father's, slower than my father's, if you will.
Q And your onset was at what age?
A Well, it was genetically tested at 39 but, you know, I was tested because I was showing symptoms and I got to the point

where I needed to know. So I would say I was probably in my mid-30's when I started being suspicious.

Q And you're how old now?

A 44. Almost 45.

Q And at what age did your father start to need a walker?

A 50.

Q And between his age of 45 and 50, how quickly did he progress to needing the walker? Was it a sudden jump or was it just gradual? All of a sudden, he needed the balance help?

A It was -- well, at the time, my relationship with my father, I was a little bit disjointed with him as far as giving him care or my regular dealings with him so I would have to say it didn't happen all of a sudden overnight but it was definitely a progressive thing.

Q And have you done any research on the web or, as you mentioned, going to meetings over at the hospital with people with the same disease? What is your expectation of your ability to continue as a professional photographer in the near future?

A Not good. That is primarily why I am moving my resources to being more of an educator, trying to get into CDIA teaching because I know that I will ultimately have a longer career in that realm and then the need to have the gallery is again a way to give me something that I can work with, that I know I can work with in my means, because I know I'm on borrowed time as

far as actually being able to take pictures. It affects me basically every time I'm taking picture. I have effects of it. It's just how I deal with it.

Q In --

THE COURT: Excuse me. Let me ask one question before -- I'm asking strictly from your own personal knowledge, either dealing with yourself or from what you've seen taking care of your father, does this condition -- have you seen anything resembling a remission or standing still of the condition or is it a steadily progressive thing that just keeps moving?

THE WITNESS: Steadily progressive. It keeps moving.

THE COURT: You haven't noticed any relief or break in the situation?

THE WITNESS: No, I haven't.

THE COURT: With yourself or your father?

THE WITNESS: No, I haven't.

THE COURT: The reason I'm going a little bit afield here is because of the -- if we had the doctor here, we could find out a lot of these things firsthand from an expert but we'll work with what we have. Thank you.

BY MR. ORR:

Q Are you on any medication regarding treatment for MJD?

A No.

Q Do you know if there is any?

A The only thing that was prescribed to me maybe less than a year ago, were forms of anti-depressants to help me cope with the emotional aspects which I chose not to take because I just didn't feel right taking them.

Q You mean you didn't right that you needed them or you didn't like the side effects?

A I didn't like the side effects.

Q Is the maintaining the gallery and maintaining the Light Year as long as it's at least a break even proposition, something of value to you other than an income?

A Well, my personal integrity as a person with a career, yeah. It's something that I do, I love to do, and I feel I'm good at it. I've invested a lot of time and money into being as good as I possibly can. It's funny because, as I wander down this windy road, every time you take a corner, there's this glimpse of, you know, hope there's this nice job that comes up where you get some kind of publication or something. I recently had a picture appear on the cover of Nikon World calendar so these things kind of fuel the fire and serve kind of a double edged sword in that you start feeling good about your capability and your accomplishments but knowing that it's going to dissipate rather quickly is frustrating as well.

Q Well, why couldn't you just shut down the gallery and shut down your Light Year and go to CDIA and work full time?

A Well, because CDIA, being a certificate based program,

they work with working photographers. That is the essence of the program, is that they don't want, you know, somebody with an FMA or a Ph.D. teaching the classes. They want working professionals teaching their classes.

Q So it's your understanding that if you were to try and concentrate strictly on the teaching, that that job would dry up?

A Yes, if I gave up photography entirely, yes.

Q And how far did you get in college?

A I attended one semester at Berkeley College of Music in Boston.

Q So you don't have any credentials that would allow you to become a professor or a teaching of any educational institution, correct?

A Not unless --

Q Just your experience?

A That's correct.

Q Your wife testified that you had two aunts also that had the disease and that both died as a result of having MJD complications. Is it a different disease, to your understanding, for women than men or does it just affect women differently than it affects men?

A Not a different disease altogether but definitely -- as much as they know about it, the history has shown from the statistics they've gathered, it tends to affect women a little

bit worse.

Q And with what you've observed -- have observed with your father and your uncle, you have a longer period of time, do you feel, than your aunts had?

A Well --

Q A longer future, should I say?

A Well, I know for -- in reference to the -- not just because they're women. I wouldn't say that because I don't think that the evidence that I've been given has shown me that that alone is a good enough reason to feel confident that it wouldn't affect me quickly but the progression of the disease was very severe in my aunt and she passed away some 20 years ago and my cousin, which was the other one, the other -- which was her daughter, also had it. They had very severe strains of this and she died just recently and she was my age.

Q And have you noticed any difference in the speed of progression between your father and yourself or your uncle and yourself?

A No. I kind of use my father as kind of a ruler, you know, knowing that the statistics show that progressively it gets a little worse through generations so that I would progress, on average, typically a little bit quicker than he would and so I use him kind of as a ruler, like when he needs a walker, when he goes into a wheelchair, when he needs assisted living, things like that. So -- did I answer that question or am I

beating myself?

Q I think you've answered it. Yes.

A Okay.

Q What kind of care do you give your father or does he receive from the assisted living that you see yourself needing in the future?

A Well, when my father gets out of bed in the morning, he transfers himself into his wheelchair and that's where he lives all day until he transfers himself back to bed to go to sleep. The only variable from that is if he needs to use the facilities and those are the areas that he's most vulnerable. A And of recent, over the last week, I've gotten a phone call for -- three times now he has now fallen, just transferring to the toilet. So that's when he is vacated from his security which would either be his bed or his wheelchair. He is totally susceptible. He's lost strength in his arms so he can't hold his body up. His walking is basically -- he doesn't use his legs anymore which is, you know -- part of the atrophy of the disease is that because you have lost balance, you tend to not walk that much and by not walking that much, you lose your muscle tone and it just progresses.

Q Now, would working out on a regular basis stave off to any degree the effects of the disease?

A There's no guarantee of that but it wouldn't hurt.

Q And were you doing that?

A Yes. I was doing that until maybe two or three years ago. We had a gym membership.
Q And why did you stop?
A We couldn't afford to stay.
Q So do you take walks now?
A We try to take walks when we can, when weather permits and time permits. Other than that, I think I probably unfortunately probably dropped 40 pounds in the last -- in the course of the last six months to a year so I can see my physical presence and my physical existence kind of dwindling which is a frustration, I must admit.
THE COURT: Are you eligible for any kind of medicaid assistance? I'm thinking of therapy possibly, you know, that would replace the gym things that you used to do?
THE WITNESS: The only therapy that I've been made aware of through my neurologist would be, you know, just staying as active as you possibly can. Obviously, being safer by using a cane or walker, whatever is necessary to keep you safe, but just staying active, keeping moving. Nothing -- I've not been advised to take any kind of specific kind of occupational or otherwise therapy.
THE COURT: The reason I asked is because you said you used to go to the gym but you had to drop that because of the cost. I guess, if it's possible, maybe having nothing to do with this case, you might want to look into whether Medicaid

would be inconvenient for the debtors, therefore they get discharged. I can't -- I'm not sure -- I hope I fall somewhere in the more moderate category of judge and I'm not sure what the perception is by people who practice here and who try these cases here. I guess Mr. Ionnatti might have a better answer to that than I would.

I think, and this is tipping my hand earlier than I thought I would, but in this situation, I think that Mr. Alvanas' case is pretty much of a no-brainer and, you know, I don't know if it would have been different if his doctor had to come in and be cross examined. I think it was very considerate and professional for the creditors here to agree that his report should be the evidence. We've got quite a bit of -- a good deal of hearsay evidence that might not have been able to come in, that both parties were being obstreperous with objections, which we do tolerate, I guess. But I guess a lot of hearsay does get in which probably should get in. You know, the old saw about there's no jury here. I don't think that's an excuse for taking evidence that the Court should never have heard in the first place but I do think that, as I say, both sides behaved very civilly regarding trying to get the full story before the Court. The Court appreciates that.

As I said, the 800 pound gorilla in Mr. Alvanas' case is basically his physical condition. I'm satisfied, and I don't think it's a stretch or any kind of a conclusion that it

isn't warranted that his condition is -- it's a serious one. I don't think there's any basis for the Court to think that it's going to either level off or go into remission or get better and, you know, that's a whole separate tragedy in its own way. But as far as the Court's requirement to look at how that condition impacts on the outcome of this case, that's -- it's just there and there's nothing that -- I don't think anything has been shown that is going to alleviate that or cause anything that would constitute anything but a hardship if he were required to continue to have to worry about that one.

I think Mrs. Alvanas' disability, if we want to call it that, is that she is a poetry teacher and, although she is -- you know, she's got herself painted into a pretty narrow -- how can I put it -- way of earning a living. I know that the testimony is that she's willing to take other types of work, had sent applications on jobs outside of college teaching in a particular course even. But it's also apparent that there are many things that are not -- to me, at least, it's apparent that they're not her thing. I know if I owned a used car business or an insurance agency, I wouldn't want to have her as one of my sales staff. Okay. That's just the way it is and I don't think that she would succeed in lines of work that are not pretty close to what she has, as I say, chosen or studied for. It's a shame but the fact that she does have the equivalent of a masters degree doesn't even qualify her to teach elementary

school or grade school English, poetry or whatever type of English classes that might be available. That's another quirk in the system but there it is.

The expenses. There doesn't seem to be much area for dispute. I have to mention that both witnesses are very credible. No reason for the Court to discount what they've told me. There doesn't seem to be much dispute over what the numbers are. The expenses are almost $3,400 a month; the income around $2,300. A thousand dollar a month shortfall is obvious and the fact that -- somebody used the expression that the well has run dry as far as outside help or at least it will be running dry. There is no evidence that either debtor's parents are well to do so that this lending program or gifting or whatever it is can go on indefinitely.

The figures just don't allow for an order, number one, requiring the debtors to continue to pay on either loan. I think we've passed the hardship issue without any trouble. Many times where the case is not this clear and where the case, especially in the case of Mr. Alvanas, is not as serious regarding a physical impairment that's permanent and progressive, I have in cases, and I'm not sure if Mr. Ionnatti was involved or -- I doubt it -- but there have been cases where I have, you know, in one that might generate some sympathy but we had, you know, a single mom raising a young daughter who had -- her financial picture right now was pretty

grim. It didn't call for an order but I believe that the case went on at this Court's insistence over a period of four or five years, having that debtor come back each year and report to us what her financial and living situation was each time and, because the Court really felt as though a person with her apparent ability to improve the situation should have to come back and explain or at least give it a better try than we thought was happening, at least the first one or two times in court. Eventually, I was satisfied that there was no pot of gold at the end of her rainbow and I think most of, or many of, my colleagues would think that is a really Draconian approach that this Court took. The case has no similarity to this one.

I believe that the picture doesn't call for postponing matters to see what happens next year. I think it would be an added expense for the creditors and unnecessary and a fruitless one. As I said, the evidence is fresh in all of our minds. I'm not going to go over each detail. No increase in income is foreseeable. No decrease in expenses is in the wind. The anecdotal evidence about Christopher's father and his uncle and I guess an aunt and a cousin, it all just supports the situation he's in which is really unfortunate but there it is and he is, I think, dealing as well as he can with it. The fact that he's in a self-employed situation that doesn't produce very much of a net income is not something that, based on the evidence that I think can be cured. If he

goes out and works for another photographer, there is no telling what the bottom line might be, if he could do it. We run across the other problem of being sent on assignments that just don't -- that are not permitted or permissible given his inability to spend long periods of time being very mobile on his feet, following people around and taking pictures of action things that just aren't in the cards for him.

I'm satisfied that, you know, the fact that the house was sold in 2003 with $40,000 equity going to the debtors, I'm satisfied that the explanation is that half of it was used for a start up business; the rest went to pay living expenses and I guess it was at a time when Mrs. Alvanas was, I think, not working, let go from Roger Williams.

One could quarrel with the fact that Christopher, you know, has a job where he might have to eat out once in a while or stay overnight maybe three or four times a year. The alternative to that, I don't know that there is one. I don't believe I heard a viable one. I don't think that the case should turn on whether the debtors have bottled water or if there's a hair salon visit once every five or six weeks. It's all relative and, as I said, every judge's experience and I'll say tolerance for the so-called luxuries is different. I haven't seen any extravagances in this case. I asked the question myself, wondering what there might be out there, but I'm satisfied that very often stuff like that does tip the

scales in the creditor's favor if it's at all significant but it has to be much richer than what we've seen here for my blood at least. Possibly, a different judge might be swayed by what we have here but I kind of doubt it.

I think there was testimony that these people are even willing to relocate if Mrs. Alvanas could get significant work and income somewhere else. That hasn't happened and I don't think it's because she has her head in the sand or because she hasn't tried. Possibly if she's more aggressive, something might be out there but, as I said earlier, I don't believe that many of the, outside of the teaching type jobs, would be available after an interview. I just don't see it. She is a person who I think is well suited but limited to the kind of work that she has trained for recently.

The Court is satisfied and am frankly impressed by Mr. Alvanas' statement that he has opted to continue to work as long as he is able to and to even modify what type of work that he is going to be suited for in the future rather than, you know, get onto government subsidies and government assistance and would find it very difficult to fault him and, in effect, punish him for having that attitude.

I think that's about it. If anybody needs to call anything to my attention that I've either misstated or have possibly taken a wrong slant on, I'm not inviting long final arguments but just anything I've said that's given you the

Case 1:07-cv-00024-ML-DLM Document 7 Filed 03/19/2007 Page 47 of 61



A No.

Q Any contributions come out of your paycheck from Dean to those?

A No.

Q Anything from Dartmouth?

A No.

Q So at the end of the month what are your total expenses come to?

A $3,392.

Q And what is your income at the end of the month between you and Chris?

A My income is $1481. Chris' income I'm not certain. I have -- I don't have a monthly number for Chris.

Q Somewhere in the 200, $300 range?

A Probably. Yes.

THE COURT: What was that?

MR. ORR: Two or $300.

THE COURT: So give me a bottom line then. You do the math.

A Between mine and --

THE COURT: Both. Yes.

A -- my husband's?

THE COURT: Yes.

A It's around 35 or 36. I'm sorry, you wanted monthly. It would be nice if I made that much monthly. Mine is 14. If I

A Normally there's a contract and, if you're under contract for, say, two years, it becomes -- you have it on their image bank for two years and you have to live out that contract or write an exception and have it approved to be pulled off.

Q Do you have a general idea of how much income that's brought in in 2006?

A Yeah. Technically, none. I haven't had any sales on Almay which I am a member of. Rubber Ball, my images have seen some movement and have seen some sales but I'm still working of an advance that they gave me to do a shoot. A lot of time, an agency will give a photographer an advance. This particular job gave me a $4,000 advance to put this job together, to hire the talent, hire the whatever, and put the image -- give the images to them. They put the images up and then, as they make money, I pay that back. And once I pay all that back, I can start realizing money. And typically the agencies pay about 20 percent of what they make on the image back to the photographer.

Q Now, your wife testified to the family expenses on a monthly basis that averaged $3,392 a month and if you were able to pay those all yourself rather than take loans from the family, that's what they are, $3,392, correct?

A Correct.

Q And her income monthly after taxes and your income is about $2,300, is that correct?

Q And how much money do you earn per week?
A Per week? About $500 gross.
Q I'm going to show you what's part of Plaintiff's Exhibit B.
(Pause)
Q Are you familiar with that document?
A It looks like my paycheck.
Q Is that your -- the first one that you received in September?
A That says paid again 9/3 so yes, that would be it.
Q And is there an indication on that pay check how many hours you're being paid for?
A I don't think so. I see under hours it says 40.
Q Right.
A But --
Q That what I've been referring to.
Q Do you receive one of these pay stubs every week?
A I get paid every two weeks.
Q Every two weeks.
A And I have direct deposit so this ends up in my mailbox at school.
Q So it is an amount that is under earnings. Do you see that?
A Yes.
Q Where it says 1237.50. Now, is that for one week or two

**University of Massachusetts**
285 Old Westport Road, Admin Bldg. Room 233
No. Dartmouth, MA 02747

| | | | |
|---|---|---|---|
| Pay Group: | UMD-UMass Dartmouth | Business Unit: | UMDAR |
| Pay Begin Date: | 09/03/2006 | Check #: | 1170940 |
| Pay End Date: | 09/16/2006 | Check Date: | 09/22/2006 |

Shari A. Alvanas
184 Willow Lane
Portsmouth RI 02871

Employee ID: 10087718
Department: D246000-English Department
Location: Liberal Arts & Business Grp I

| TAX DATA: | Federal | State |
|---|---|---|
| Marital Status: | Married | |
| Allowances: | 1 | 1 |
| Addl. Pct.: | | |
| Addl. Amt.: | | |

**HOURS AND EARNINGS**

| Description | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| Regular Fac Teach | 30.937500 | 40.00 | 1,237.50 | 40.00 | 1,237.50 |
| Total: | | | 1,237.50 | | 1,237.50 |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 77.86 | 77.86 |
| Fed FICA/EE | 17.94 | 17.94 |
| MA Withholdng | 51.87 | 51.87 |
| Total: | 147.67 | 147.67 |

**BEFORE-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Alternative Retrmnt Mandatory | 92.81 | 92.81 |
| Total: | 92.81 | 92.81 |

**AFTER-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Total: | 0.00 | 0.00 |

**EMPLOYER PAID BENEFITS**

| Description | Current | YTD |
|---|---|---|

* Taxable

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 1,237.50 | 1,144.69 | 147.67 | 92.81 | 997.02 |
| YTD: | 1,237.50 | 1,144.69 | 147.67 | 92.81 | 997.02 |

| AVAILABLE HOURS | | COMP TIME BALANCES |
|---|---|---|
| Vacation: | 0.00 | |
| Personal: | 0.00 | |
| Sick: | 0.00 | |

**NET PAY DISTRIBUTION**

| | |
|---|---|
| Check #1170940 | 997.02 |
| Total: | 997.02 |

MESSAGE:

be considered a salary to you and that you took that and put it into household expenses.

A You mean other than equipment, things like that?

Q Right.

A Yeah. Correct.

Q And that was 1200 -- so about $5000 that Lightyear -- you probably took as a salary in the last 11 months and used that as house expenses, is that a correct statement?

A Yes.

Q That's about $450 a month?

A Yes.

Q Now one of the documents that has been stipulated to is your payment history for your loan. And that was stipulated to between Mr. Seedorf and I a week or so ago. And this shows a pretty steady payment schedule from 2003 until you filed bankruptcy. Is that the best of your recollection?

A Yes, it is.

Q Did you at anytime ask for a forbearance or anything else before you consolidated these loans?

A I wouldn't have -- my wife's handling most of the loan -- student loan stuff, but not that I'm aware of.

Q And it says here that you made payments totaling 5380.99.

A Yes, that's correct.

Q I'd like to get back to your condition, the MJD. The doctor in his report mentioned that your uncle and your father,

**CHRISTOPHER ALVANAS**
**PAYMENT HISTORY**

| POSTED DATE | EFFECTIVE DATE | TRANSACTION AMOUNT |
|---|---|---|
| 09/22/05 | 09/22/05 | 231.12 |
| 08/27/05 | 08/27/05 | 231.12 |
| 07/04/05 | 07/04/05 | 231.12 |
| 06/24/05 | 06/24/05 | 231.12 |
| 05/08/05 | 05/07/05 | 231.12 |
| 03/31/05 | 03/31/05 | 231.12 |
| 02/21/05 | 02/21/05 | 231.12 |
| 01/18/05 | 01/18/05 | 231.12 |
| 12/11/04 | 12/11/04 | 379.91 |
| 11/17/04 | 11/17/04 | 231.12 |
| 10/14/04 | 10/14/04 | 231.12 |
| 09/07/04 | 09/07/04 | 231.12 |
| 08/13/04 | 08/13/04 | 231.12 |
| 06/01/04 | 06/01/04 | 231.12 |
| 05/18/04 | 05/18/04 | 231.12 |
| 04/22/04 | 04/22/04 | 231.12 |
| 02/20/04 | 02/20/04 | 111.00 |
| 02/03/04 | 01/22/04 | 111.07 |
| 01/29/04 | 01/29/04 | 202.45 |
| 01/14/04 | 01/14/04 | 202.45 |
| 12/01/03 | 12/01/03 | 202.45 |
| 11/20/03 | 10/15/03 | 482.86 |
| 11/13/03 | 11/13/03 | 222.00 |
| **TOTAL** | | **5,380.99** |

## Payment History Sheet

Borrower SSN: [redacted]
Borrower: ALVANAS, SHARI A

| Total Disbursed | Total Refunds & Rebates | Net Disbursed |
|---|---|---|
| $48,823.93 | $87.40 | $48,736.53 |

**Date:** 12/29/05

| Transaction Date | Transaction | Total Payment Received | Principal Paid | Interest Paid | Interest Accrued to Date | Interest Capitalization | Running Principal Balance | New Disbursement |
|---|---|---|---|---|---|---|---|---|
| 10/12/00 | Pay On-time Begins | | | | $0.00 | | $0.00 | |
| 10/12/00 | Loan Disbursement | | | | $0.00 | | $31,930.98 | $31,930.98 |
| 10/12/00 | Loan Disbursement | | | | $0.00 | | $48,736.53 | $16,805.55 |
| 11/01/00 | Grace End | | | | $198.82 | | $48,736.53 | |
| 11/01/00 | Repayment Begins | | | | $198.82 | | $48,736.53 | |
| 12/03/00 | Deferment Start | | | | $516.92 | | $48,736.53 | |
| 07/01/01 | Interest Rate Change | | | | $1,236.76 | | $48,736.53 | |
| 07/01/02 | Interest Rate Change | | | | $2,487.92 | | $48,736.53 | |
| 03/29/03 | Deferment End | | | | $3,416.79 | $3,416.79 | $52,153.32 | |
| 05/14/03 | Payment | $411.60 | $0.00 | $411.60 | $489.34 | | $52,153.32 | |
| 06/09/03 | Payment | $411.60 | $57.28 | $354.32 | $354.32 | | $52,096.04 | |
| 07/01/03 | Interest Rate Change | | | | $233.77 | | $52,096.04 | |
| 07/14/03 | Payment | $411.60 | $39.69 | $371.91 | $371.91 | | $52,056.35 | |
| 08/11/03 | Payment | $411.60 | $114.30 | $297.30 | $297.30 | | $51,942.05 | |
| 09/15/03 | Payment | $411.60 | $40.79 | $370.81 | $370.81 | | $51,901.26 | |
| 10/09/03 | Payment | $411.60 | $157.53 | $254.07 | $254.07 | | $51,743.73 | |
| 12/01/03 | Payment | $411.60 | $0.00 | $411.60 | $559.37 | | $51,743.73 | |
| 01/12/04 | Payment | $823.20 | $232.15 | $591.05 | $591.05 | | $51,511.58 | |
| 02/23/04 | Payment | $411.00 | $0.00 | $411.00 | $441.29 | | $51,511.58 | |
| 03/25/04 | Payment | $411.60 | $55.60 | $356.00 | $356.00 | | $51,455.98 | |
| 04/30/04 | Payment | $412.20 | $34.36 | $377.84 | $377.84 | | $51,421.62 | |
| 05/14/04 | Rebate Lost | | | | $146.84 | | $51,421.62 | $0.00 |
| 05/14/04 | Pay On-time End | | | | $146.84 | | $51,421.62 | |
| 05/18/04 | Payment | $411.60 | $218.30 | $193.30 | $193.30 | | $51,203.32 | |
| 06/02/04 | Payment | $823.20 | $649.65 | $173.55 | $173.55 | | $50,553.67 | |
| 07/01/04 | Interest Rate Change | | | | $331.14 | | $50,553.67 | |
| 08/16/04 | Payment | $411.00 | $0.00 | $411.00 | $856.40 | | $50,553.67 | |
| 10/07/04 | Forbearance Start | | | | $1,039.17 | | $50,553.67 | |
| 10/08/04 | Payment | $411.60 | $0.00 | $411.60 | $1,050.59 | | $50,553.67 | |
| 11/05/04 | Payment | $411.60 | $0.00 | $411.60 | $958.72 | | $50,553.67 | |
| 12/06/04 | Payment | $411.60 | $0.00 | $411.60 | $901.10 | | $50,553.67 | |
| 01/07/05 | Payment | $411.60 | $0.00 | $411.60 | $854.89 | | $50,553.67 | |
| 01/31/05 | Payment | $1,234.80 | $517.46 | $717.34 | $717.34 | | $50,136.21 | |
| 05/09/05 | Payment | $411.60 | $0.00 | $411.60 | $1,107.58 | | $50,036.21 | |
| 06/24/05 | Payment | $823.20 | $0.00 | $823.20 | $1,215.86 | | $50,036.21 | |
| 07/01/05 | Interest Rate Change | | | | $471.77 | | $50,036.21 | |
| 07/18/05 | Payment | $411.60 | $0.00 | $411.60 | $663.90 | | $50,036.21 | |
| 08/22/05 | Payment | $411.60 | $0.00 | $411.60 | $647.87 | | $50,036.21 | |
| 09/21/05 | Payment | $411.60 | $0.00 | $411.60 | $575.32 | | $50,036.21 | |
| 12/29/05 | Accrued Through Date | | | | $1,282.43 | | $50,036.21 | |

| Total Payment Received | Total Principal Paid | Total Interest Paid |
|---|---|---|
| $11,935.80 | $2,118.40 | $9,817.40 |

| Total Capitalization | Ending Balance |
|---|---|
| $3,416.79 | $50,036.21 |

GOVERNMENT EXHIBIT
US-2

filed bankruptcy as far as your monthly budget as opposed to income?

A Yeah.

Q And is that because of your position or inability to get a position similar to your Roger Williams position?

A Yes.

Q What did Roger Williams pay you?

A I think my last year there I was getting paid between 34 and 36. I'm not sure because we also got professional development money which put us up $1500 on top of our salary. So it was somewhere between 34 and 36.

Q And at that time you were at Roger Williams your husband was working at his position at his photography business, is that correct?

A Right.

Q And when you filed for the bankruptcy he was making more money than he is today, is that correct?

A Yes.

Q Do you know about what your husband contributes on a monthly basis to the family budget?

A I'm just looking at my notes here. I'm more familiar with the household than -- do you mean how much goes into the house?

Q Right.

A Well, I think the last four months the health insurance which is $1000 a month has come directly out of Chris'

business. Beyond that it's, you know, we're kind of in survival mode. Wherever there's money it comes from and pays the bills. And if it's not there then we ask.

Q Now, your monthly expenses, you just mentioned health insurance. Could you explain to the Court what your health insurance situation is at this point?

A Yes. We have COBRA through -- this is the plan that I had when I was at Roger Williams. So we pay Altus Benefitters I think is the name of the company. It's COBRA. It's $1000 a month, and that keeps us on our health care. We had to let the dental go because we couldn't afford the additional payment.

THE COURT: You said you were under some kind of a COBRA plan now?

A Yes. We pay. I think it's called Altus Benefitters. It's who we pay for our COBRA which keeps us on the same plan that we had at Roger Williams.

THE COURT: And how long will that last since you've left Roger Williams?

A It will end in January.

THE COURT: In January.

Q Have you made any investigations as to what a new insurance policy will cost you come January?

A Yes. Right now we're paying a thousand and as of January we'll pay 1073, but it's not the same plan because they don't offer that for self-pay. So where we had the $200 deductible

Case 1:07-cv-00024-ML-DLM Document 7 Filed 03/19/2007 Page 56 of 61



on the plan we have now it's a $400 deductible. And I can't really get an answer as to how my prescription plan will change. Right now we have about a five to $10 co-pay on average. And our doctor's visits are $25. I can't get a handle on what that will be on the new plan.

Q At this time what do your monthly prescriptions run for you and your husband?

A Well, with the co-pay it's only costing us right now about $40 a month.

Q Do you have any idea what the actual cost of those drugs are?

A Yeah, I do. I added up mine and my prescriptions are $267.15 if I paid out of pocket.

Q So is it your understanding that you have to pay that amount of money at least two months to get that $400 deductible taken care of?

A Yes.

Q Or pay a full doctor's visit if it's a doctor's visit or an emergency room visit?

A Yes.

Q But they haven't explained to you what you co-pay would be after that for drugs?

A No.

Q What other monthly expenses do you have?

A Food, electric, rent.

Q And could you give the Court an idea of what your monthly expenses are and your total monthly budget.
A Our food is about $587.
Q Does that include dog food for the two dogs?
A No, that we have under our grocery bill. I'm just trying to see how much that is. Yeah, sorry, the food and grocery is the same thing. Yes.
Q And also you have some cats, too, right?
A Yes, we do.
Q And so all of that is included in that 580.
A Yes.
Q And utilities.
A Our electric is $79, our phone is 42, our oil/heat is 110.
Q Now, that oil/heat, that's the last couple months, correct?
A Yeah.
Q And we've had a pretty mild fall so far. Do you have any recollection of what it was last year during the real winter months, March, February?
A I'm not sure when that -- when it was so high? I don't recall. I'm sure it's more than what it is now just basing it on what my commute was last year to work in terms of gas. I know they tend to be about the same.
Q Well, in regards to the home heating oil I'm talking.
A Yeah. I'm just saying that when the gas went up the

hearing oil went up so I'm sure it was more than the 110 that we're paying now, but I don't recall how much it was. I remember at one point getting the tank filled and having it be 300 plus.

Q So it's your expectation that your heating bills will be higher as the winter progresses.

A Yes.

Q And continue on, please.

A We have an Internet cable bill that's $54 a month?

THE COURT: How much, 54?

A Fifty-four.

Q Now, an Internet cable, that's not a luxury for you, is it?

A No, it's Internet which our daughter uses probably five times a week for homework. And then it's just basic cable.

Q And you use that for your position?

A Yes.

Q And your husband uses it for his work?

A Um-hum. Because I have to check email through my UMass account. I'm only on campus two days a week. So I check it the other five days to see if any students need to reach me for anything.

Q Okay. Continue, please.

A I think that's everything as far as utilities goes.

Q Do you have transportation costs? Gas, oil, maintenance

on your cars?
A Chris' bill for -- Chris tends to use the Mobile gas card. His is about $190 a month. Mine comes out of cash. I'm a little -- I tend to shop around at gas stations and find the cheapest price. So, I mean, our cash per month that comes out is about 325. That includes my gas bill as well as running to the grocery store to get milk or bread or something like that.
Q Now, when you talked about your husband's gas bill where does he drive that has that high of a usage?
A Well, if he's just driving to the gallery it's not that far, it's a five minute commute. But when he's teaching in Waltham it's I'm guessing about 150 miles round trip. I'm not certain.
Q And, of course, when the gas was $3.10 a gallon it was a considerably higher expense.
A Yes.
Q And if the gas goes up that expense will go up, correct?
A Correct.
Q Automobile repairs.
A Well, the most recent one was my car. That was $2500. It needed a new radiator, head gasket and I don't recall what else. I know there were things they said while we have it open we'll do this. I was without the car for about a week and half and we had to borrow $2500 from my parents to pay that bill to get the car back.

Q How old is that vehicle?
A It's a 2000.
Q What type?
A Subaru Forrester.
Q And your husband's car, what year is that?
A It's older. I think it's a '98. And it's a Subaru Legacy Wagon.
Q Has that had any repairs that you know of in the last year?
A It has, but I don't recall the amount. I know it was in the spring for repair.
Q Now, do you have automobile insurance?
A We do.
Q And what is that per month?
A $95.00.
Q And has that been an item that you've been able to pay on a regular basis?
A No. We actually lost our car insurance over the summer and we weren't made aware by our insurance agent until September of late September, maybe it was earlier October and we had to switch insurance companies. But we actually thought we had insurance for almost three months and didn't.
Q Now, why was that payment not made?
A Well, I didn't make the payment because there wasn't money there. That was during the summertime and I had applied for

unemployment, but my last paycheck that came in from Dean was mid-May.

THE COURT: You just didn't have the money.

A Yeah.

THE COURT: Okay.

Q Can you continue with the family expenses, please.

A I think the only other thing I have in here is spring water which is $34 a month. Pharmacy is $92 a month.

THE COURT: Pharmacy, that's separate from your prescription?

A That's my prescription and if we pick up Advil, cough medicine, anything like that at the pharmacy. But my prescriptions are 40 per month.

THE COURT: Okay.

Q Now, do you have any life insurance costs, any other insurances besides your health and your auto insurance?

A No.

Q When you filed bankruptcy you had a 528 college fund for your daughter.

A Right.

Q Have there been any more payments to that since the bankruptcy filing?

A No.

Q You also had two, if I recall, accounts for retirement. Have you made any contributions to those?