UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES DEPARTMENT OF EDUCATION, and COLLEGE ACCESS NETWORK Defendants-Appellants | ) | |
| | ) | Case No. 07-0024ML |
| v. | ) | |
| CHRISTOPHER M. ALVANAS and SHARI A. ALVANAS, Plaintiffs-Appellees | ) | BRIEF OF APPELLANTS |

TABLE OF AUTHORITIES....................................ii

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION.......... 1

STATEMENT OF ISSUES PRESENTED ........................... 2

STANDARD OF APPELLATE REVIEW ............................ 3

I. STATEMENT OF THE CASE...................................5

A. TRAVEL ...........................................5

B. FACTS

1. The Alvanas Family Situation..................5

2. Shari Alvanas' Education and Work History.....6

3. Christopher Alvanas' Education and Work History ................................................8

4. Christopher Alvanas' Medical Condition .... 14

5. The Sale of Real Property and Startup costs of Lightyear Imaging and Hope Gallery ......... 20

6. The Alvanas' Expenses ..................... 22

7. The Alvanas Student Loan Debt

a. Chrstopher Alvanas.......................24

b. Shari Alvanas...........................25

II ARGUMENT

A. The plaintiff-debtors, now, and in the foreseeable future, are able to maintain a reasonable, minimal standard of living for the plaintiff-debtors and the plaintiff-debtors' dependants and still make payments on the plaintiff-debtors' student loans ..........................................28

B. The bankruptcy Court improperly admitted and considered as evidence lay testimony regarding the medical condition of individuals related to the plaintiff-debtor, Christopher Alvanas. ..........................................35

III. CONCLUSION.......................................38

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Bezanson v. Thomas (In re R & R Associates of Hampton),
402 F.3d 257, 264 (1st Cir. 2005)................................**3**

Block v. United States Dep't of Educ.,
273 B.R. 600, 605 (Bankr. W.D. Mo. 2002)........................**30**

Boroff v. Tully (In Re Tully),
818 F.2d 106, 109 (1st Cir. 1987)............................**3, 4**

In re Bourque,
305 B.R. 548, 551 (Bankr. D. Mass. 2003)........................**29**

Burkhead v. Educ. Credit Mgmt. Corp. (In re Burkhead),
304 B.R. 560, 565 (Bankr. D. Mass. 2004)....................**29, 36**

Casco Northern Bank v. DN Assoc. (In Re DN Associates),
3 F.3d 512, 515 (1st Cir. 1993)..................................**3**

Clark v. Educ. Credit Mgmt. Corp.,
273 B.R. 207, 210 (Bankr. N.D. Iowa 2002).......................**30**

TI Federal Credit Union v. DelBonis,
72 F.3d 921, 927 (1st Cir. 1995)................................**28**

U.S. Dept. of Ed. V. Gerhardt (In re Gerhardt),
348 F.3d 89, 92 (5th Cir. 2003).................................**29**

Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks),
331 B.R. 18, 31 (Bankr. D. Mass. 2005)..................**30, 31, 35**

Irons v. FBI,
811 F.2d 681, 684 (1st Cir. 1987) .............................. **4**

Kelly In Re: Kelly,
312 B.R. 200, 204 (1st Cir. BAP, 2004)..........................**3**

State University New York Student
Loan Service Center v. Menezes,
352 B.R. 8, (D. Mass, 2006)..................................**3, 4**

Nash v. Conn. Student Loan Foundation

et. al (In Re Nash),
446 F.3d 188, 191 (1st Cir. 2006)......................**28, 28, 38**

In Re Phelps,
237 B.R. 527 at 535 (Bankr. D. RI. 1999).......................**29**

United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1111 (9th Cir. 1998).................................**29**

*Rose v. United States Dep't of Educ.*,
227 B.R. 518, 525 (Bankr. W.D. Mo. 1998), *aff'd in part, remanded in part*, 187 F.3d 926 (8th Cir. 1999).........................**31**

Smith v Educational Credit Management Corporation,
328 B.R. 605 , 609 (1st Cir. BAP, 2005).....................**3, 28**

**STATUTES**

11 U.S.C. § 523(a)(8)..................................5, 28, 29

28 U.S.C. § 158..........................................1

FED.R.EVID. 701.........................................36

## **STATEMENT OF THE BASIS OF APPELLATE JURISDICTION**

The United States District Court for the District of Rhode Island has jurisdiction over this appeal under 28 U.S.C. § 158.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

A. Whether the plaintiff-debtors, now, and in the foreseeable future, will be able to maintain a reasonable, minimal standard of living for the plaintiff-debtors and the plaintiff-debtors' dependants and still be able to make payments on the plaintiff-debtors' student loans.

B. Whether the bankruptcy Court improperly admitted and considered as evidence, lay testimony regarding the medical condition of individuals related to the plaintiff-debtor, Christopher Alvanas.

## STANDARD OF APPELLATE REVIEW

Where a matter is before the District Court on an appeal taken after trial in the Bankruptcy Court, the court reviews questions of law *de novo* and applies the clearly erroneous standard to findings of facts. *See* State University New York Student Loan Service Center v. Menezes, 352 B.R. 8, (D. Mass, 2006), *Quoting* Casco Northern Bank v. DN Assoc. (In Re DN Associates), 3 F.3d 512, 515 (1st Cir. 1993). Although the First Circuit has not formally adopted a specific approach to the review of determinations under 11 U.S.C. §532(a)(8), the court applies the de novo standard to the legal conclusion of undue hardship. *See* Smith v Educational Credit Management Corporation, 328 B.R. 605 , 609 (1st Cir. BAP, 2005), *quoting* In Re: Kelly, 312 B.R. 200, 204 (1st Cir. BAP, 2004). "The bankruptcy court findings will be considered clearly erroneous if, *after a review of the entire record* [the court is] left with the definite and firm conviction that a mistake has been committed." Menezes, 352 B.R. 8 at 12, *quoting* Bezanson v. Thomas (In re R & R Associates of Hampton), 402 F.3d 257, 264 (1st Cir. 2005); (citation and internal quotation omitted)(emphasis added); Boroff v. Tully (In Re Tully), 818 F.2d 106, 109 (1st Cir. 1987)(same). "'[Where the conclusions of the [trier] depend on its election among conflicting facts or its choice of which competing inferences to

draw from undisputed basic facts, appellate courts should defer to such fact-intensive findings, absent clear error.'" Menezes, 352 B.R. 8 at 12, *quoting* Tully, 818 F.2d at 109 (*quoting* Irons v. FBI, 811 F.2d 681, 684 (1st Cir. 1987)).

## I. STATEMENT OF THE CASE

### A. TRAVEL

This matter comes before the Court on appeal from the Bankruptcy Court's December 12, 2006 order discharging the plaintiff-debtors' student loan obligations owed to the defendants. Alvanas v. College Access Network and United States Department of Education (In re: Alvanas), (AP 05-01083, BK 05-15052, Bankr. D. RI. 2006) ("Order"). Most debts are automatically discharged in a bankruptcy proceeding, but Congress provided an exception for student loan obligations, which can only be discharged upon a finding that repayment of the debt would "impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8).

### B. FACTS

#### 1. THE ALVANAS FAMILY SITUATION

The plaintiffs-appellees, Shari Alvanas ("Shari") and Christopher Alvanas ("Christopher"), are 45 years old, married and living with one dependant, a 15 year old daughter, Cassidy. The Alvanas' have been married for 26 years. In 2003, Christopher sold his interest in real property located at 724 Middle Road Portsmouth, Rhode Island that he owned with his mother. The sale was a private transaction - namely to Christopher's brother, and yielded the Alvanas' approximately

$40,000.[1] The family now lives in an apartment at the home of Shari's parents in Portsmouth, Rhode Island. The Alvanas' other child, Dustin, is 26 years old, is independent, and lives in a separate apartment in the family home. (Trial Transcript 117:24 - 118:4 and 119:1.)

**2. SHARI ALVANAS' EDUCATION AND WORK HISTORY**

Shari graduated in 1997 from Roger Williams University with a Bachelors in Fine Arts Degree in creative writing. She continued her education, and in the year 2000, graduated from Vermont College Montpelier with a Master of Fine Arts Degree in Writing. Since her graduation, she has been more or less steadily employed in her field at least part time. Beginning in September 2000, Shari worked as an adjunct professor of Creative Writing at Roger Williams University, teaching two to three classes per semester, holding two to three office hours per week, and teaching independent studies and distance learning as assigned. She earned an average gross income of $23,156 annually during each of the years of 2001 and 2002. The adjunct professor position lead to a full-time visiting professor position that was renewable up to three years, beginning in 2003, and her gross income increased to an average of $44,960 annually. During that period, Shari taught four classes per semester, acted as an

[1] The home was not sold on the open market at a time when real estate prices were high, and no evidence was offered to show that the sale represented fair market value.

academic advisor, held four office hours per week, taught independent studies and distance learning as needed, coordinated the Visiting Writers Series, and acted as the Creative Writing representative for "Alive Arts" program committees. The visiting professor position, eventually evolved into a "creative non-fiction" position in July 2005, and Shari was released because that is not her speciality area. (Trial Transcript 8:16.)

Shari then took a position as an Adjunct Professor of English at Dean College in Franklin, Massachusetts, earning an average gross salary of only $8,775, which was supplemented by unemployment insurance of about $6,751 annually. At Dean, Shari taught three classes per semester for nine hours per week, and held three office hours per week per semester. According to the 2005 Bankruptcy Schedules she earned $28,224 annually ($1,492 plus $860 unemployment per month). Shari continued to teach part time at Dean College and collect unemployment to supplement that income throughout 2006. (Trial Transcript 5:16 and Exhibit CAN 9[2]).

In September 2006, two months prior to trial, Shari's income increased when she began teaching creative writing as a part-time instructor at the University of Massachusetts Dartmouth

---

[2] See Defendant CAN's Exhibit CAN 9 "Plaintiff Shari A. Alvanas' Responses to U.S. Department of Educations's Interrogatories" Number 4.G listing monthly income from teaching, and Number 11. Listing unemployment income.

("UMass"). According to her testimony, she is paid slightly more at UMass than she was at Dean. Her biweekly gross salary at UMass is $1,237.50. Since part-time instructors are contracted on a semester by semester basis, Shari continues to seek full-time employment inside and outside the education field in order to obtain employment security and increase her income. (Trial Transcript 5:21.)

**3. <u>CHRISTOPHER ALVANAS' EDUCATION AND WORK HISTORY</u>**

Christopher is a high school graduate with one semester of course work at Berkley College of Music in Boston. From and through 2002, Christopher was primarily employed in the fiber optics industry earning an average income of $60,000. Christopher designed, operated, and worked in the maintenance of and installation of fiber optic lines for Cox Communications, Boston Edison (NSTAR-RCN), Advance Fiber Optics, and Futurecom Limited. He spent fifteen years in that field and his positions ranged from Regional Fiber Optic Manager to Director of New Business Development. During that period, his income ranged from $48,000 in 1999 to $103,000 in 2000, and $45,000 in 2002, when he left the fiber optics industry to devote himself to a career in photography. (Exhibit CAN 6 Plaintiff Christopher M. Alvanas; Responses to College Access Network's Interrogatories 4.)

In 2002, Christopher founded Lightyear Imaging ("Lightyear"), capitalizing on his 25 plus years of experience as

a professional photographer.[3] As a commercial photographer, Christopher takes photos of various sporting events such as soccer and Polo. He also sells stock photography to various "image banks" or agencies where advertisers purchase lifestyle images for marketing purposes. Christopher also sells stock photography through Lightyear which provides an online presence to promote and market his photographic and photo restoration services; to sell additional prints for commercial and private use; and to provide up to date information as to his activities in the industry. Some of the activities listed online for 2006 include: working a Fine Art college photo shoot with college dancers and professional choreographer for fine art exhibition; working an "*Undercover Wear*" catalogue shoot, shooting for Stage Door Dance, and preparing for a Dance and Jazz image exhibition at Hope Gallery. (Trial Transcript 86:11.) (Exhibit CAN 4.)

Christopher's average gross annual income from Lightyear between and through 2003 and 2004 was $35,785.[4] The 2006 Lightyear Profit and Loss statement (Plaintiff's Exhibit C),

---

[3] Recently, one of his photos appeared on the cover of "Nikon World" calendar.

[4] The October 2005 bankruptcy schedules indicated that Christopher was a self-employed photographer (four years) with an annual salary of $24,792 annually ($2,066 per month). According or the Alvanas' income tax return, gross income for Lightyear in 2004 was $32,945. Although Schedule C indicates a $12,837 loss for the year, expenses include $22,476 depreciation expense plus $6,206 car and truck expenses which were not repeated in 2005. (Plaintiff's exhibit D.)

indicates that the gross business income through November 17, 2006 was $32,018.88, and includes income from Christopher's employment as a teacher at the Center for Digital Imaging and Arts "CDIA", which is affiliated with Boston University in Waltham, Massachusetts. At CDIA, Christopher has developed a curriculum around Adobe Photoshop software and teaches a series of modules within a certificate based program to students seeking a certificate in digital photography and imaging. Christopher is paid on a per module basis, representing one week's work, at a rate of $1,200 gross per module. At trial, Christopher characterized this income as unreliable since it depends on how many students register for each particular module. However, he testified that so far in 2006 he has earned an income of close to $14,000 from his employment by CDIA. The records show that Christopher was paid a total of $5,400 by CDIA from April through June 2006. Although detailed records were not presented at trial, Christopher taught additional modules in July and at least two modules in October of 2006[5]. (Trial Transcript 75:4.) (Exhibit CAN 4).

[5] Christopher referred to the July 2006 module in the "Where am I" section of his Lightyear Imaging website, (CAN Exhibit 4). Shari testified that Christopher stays overnight in Waltham when he is called upon to teach two modules at once (one being a full-time day class five days per week, and the second being an evening class, two nights per week). According to testimony and exhibits presented at trial, Christopher stayed at the Waltham Homestead Hotel six to eight times in the twelve months before trial at the rate of $109.69 per night. (Plaintiff's Exhibit D.)

Income reported through Lightyear includes $15,475 from classes/workshops plus $15,936 from photography services, and an additional $310 income from web design. The 2006 Lightyear Profit and Loss Statement did not include income from several relatively new ventures. Recently, Christopher launched a series of DVD instructional videos and "PodCasts" that can be purchased online. In the summer of 2006, he released a Photoshop Instructional DVD. He is working on a new Advanced DVD that was due to be available in October 2006[6]. Christopher also offers instruction for users of Adobe Photoshop software and all are available worldwide through the internet. There was no evidence presented at trial as to the potential income from these new ventures.

Besides the new ventures, Christopher has several upcoming projects to keep him busy in the industry, according to his trial testimony. For example he has plans to work on fashion movies and to provide retouching work for *Beauty Alliance*, *Loreal*, and *Newport Life Magazine*. He also plans to work on *Photoshop*, *Aperture* and *Nikon NX* seminars at the *PhotoPlus Expo* in New York City. Christopher testified that he "has not had much rest" because he has been so busy with such photography and teaching

---

[6] Christopher currently sells Instructional Photoshop DVDs online through www.rickkspixelmagic.com. Each DVD retails for about $40 and offer advanced type instruction for using Adobe Photoshop Imaging digital software. (Trial Transcript 148:16 and Exhibit CAN 4.)

activities. (Trial Transcript 110:11 - 113:6, discussing some of the various above activities.)

Christopher also testified that he does a lot of work with local fashion photographer, Rob VanPeten, in an assistant's role. Christopher also teaches photography classes and works as a "mentor" several times each year for aspiring amateur photographers. In this capacity, Christopher works at least twice per year for American Photo magazine. Christopher described his role in doing "treks" as that of an instructor to follow participants around and instruct them on how to achieve their goals as photographers. The treks are either three or four days to a week depending on the location. Treks take place everywhere from remote areas like the Arches in Utah, to urban areas like New York City, and to foreign lands like Egypt. (Trial Transcript 68:25 - 69:20, 115:17 and 146:16.)

In the Spring of 2006, Christopher was paid $2,000 to lead a walking trek through a "New York City Mentor Series Trek", which included a walk across the Brooklyn Bridge. He plans to participate in another trek in the Spring of 2007 to Arches National Park in Moab, Utah before returning for another New York City Trek in June 2007. As a mentor for these treks, all of Christopher's travel and lodging expenses are paid by American Photo and Popular Photography. (Trial Transcript 69:14.)

Christopher opened a second business, Hope Gallery in Bristol, Rhode Island, in November of 2005, two months after filing the bankruptcy petition, and began operating Lightyear from the same location. Christopher is the only employee of Hope Gallery, which also has it's own website that is used to promote upcoming events and exhibitions.

Hope Gallery is an art and photo gallery where Christopher exhibits and sells artwork for local artists who rent wall space to display their work. He also sells his own photography through Hope Gallery as he does online through Lightyear. Hope Gallery is set up as an essentially non commissioned based system, however, some shows do produce commission based sales. According to the Alvanas' 2005 federal income tax return, the combined gross income from Lightyear/Hope Gallery was $25,500. As of November 2006, Christopher's gross income from Lightyear/Hope Gallery increased to about $56,807. This includes gross income reported for Hope Gallery (Gross Sales of $24,788) and Lightyear ($32,018). (Trial Transcript 76:6).

In 2006, Christopher at least made two significant purchases which offset the Lightyear/Hope Gallery income. These purchases were $5,000 for a new camera and $2,986 for computers. Rather than divide the annual expense for these items over their respective life expectancies, the full amount of the expense was listed on the profit and loss sheet for the year it was incurred,

all in spite of Christopher's testimony that he would not expect to realize such expenses every year. (Trial Transcript 138:6.)

Given that investment, Christopher should be able to realize more income from Hope Gallery in 2007. Lightyear's income should also increase substantially since, this year, Christopher is completing two treks for American Photo Magazine, teaching modules at CDIA, marketing his own DVD teaching courses and PodCasts, continuing to work as a commercial photographer, working and selling images at various sporting events such as soccer and Polo, selling lifestyle stock photography through various "image banks" or agencies, and working as a photo assistant for various fashion shoots. (Exhibit CAN 4.)

In addition to the income referenced above, the Alvanas' have also received refunds from their 2003, 2004, and 2005 federal income tax returns in the amounts of $5,316, $4,884, and $2,627 respectively. These refunds amount to an extra $219 to $443 per month to be added to the family's income. (Exhibit CAN 7.)

**4. Christopher Alvanas' Medical Condition**

In November 2002, Christopher, then 41 years of age, was diagnosed with Type III Machado-Josephs Disease "MJD". MJD is a progressive heredity disease characterized by clumsiness, and weakness in arms and legs, speech difficulty, double vision, and other symptoms. Although research is ongoing, MJD is described

as incurable, though symptoms can be treated through a combination of medications, such as antispasmodic drugs, therapy, and physical aids to assist patients with everyday activities. (Exhibit A.)

Prevalence of MJD is highest among people of Portuguese/ Azorean descent. The severity of the disease is related to the age of onset, which typically occurs anytime between early adolescence and about the age of 70. Earlier onset is associated with a more severe form. Type I MJD is the most severe form with fast progression and has an onset of between 10 and 30 years of age. Type II MJD is distinguished from Type I by intermediate progression and generally has an onset of between 20 and 50 years. Christopher has Type III MJD which is the mildest form, has a relatively slow progression, and has an onset of between 40 and 70 years of age. Life expectancy ranges from the mid-thirties for those with severe forms of MJD to a normal life expectancy for those with the milder forms. (Exhibit A and Trial Transcript 3:14).

Medical testimony was presented at trial in the form of a report by Christopher's treating physician, Dr. Carlo G. Brogna, "The Brogna Report." which was read into the record. In his report, Brogna described MJD as a progressive, degenerative neurological disease. He described the expected progression of Christopher's disease as a "slow and steady progression of

central nervous system involvement manifested by greater physical impairments over time." (Trial Transcript 61:14 and 63:2-4).

Brogna indicated that Christopher's condition has progressed over the past four years. He described Christopher's principal manifestation as gait ataxia, which refers to impairment of his ability to walk and stand due to poor balance. Brogna relates that: "Christopher presently uses a cane at all times and has to walk with his feet slightly spread apart as he is unsteady. He is still independent using the cane to walk, however, his maneuverability is significantly impaired. For example, on sidewalk or on any type environment he needs to be extremely careful as he is unsteady and may veer off to either side and if not careful, particularly on uneven surfaces could fall." (Exhibit A and Trial Transcript 62:4).

Because Brogna was unavailable to testify, the defendants could not question him regarding his observations and his assessment of Christopher's abilities. Brogna's description of Christopher's maneuverability, however, is inconsistent with Christopher's own testimony, particularly where he described his recent trek to New York City and indicated that he was planning a more physically challenging trek to Arches National Park. It is unclear whether Christopher will use his cane to walk when he travels to Utah for his trek through the "hostile environment" that is Arches National Park. He testified that "it makes it

very difficult for [him] to show up in a job like this with a cane or letting them know [he has] this condition because there would be no reason for them to hire [him] back if [he were] unable to properly navigate through the [track](sic) with the trekkers. And this obviously is going to take [him] to some elevations and some rough terrain." (Trial Transcript 70:12).

Based upon his testimony, it appears that Christopher is able to get by on these treks without using a cane, and that his employers are unaware of his condition, even though his fellow mentor on the New York City trek is local fashion photographer, Rob VanPeten, who Christopher testified that he does a lot of work with in an assistant's role, and with whom he works on a number of other projects. (Trial Transcript 115:17 and 146:16.)

In his report, Brogna also indicated that Christopher was finding his day to day functioning to be "pretty much impossible at this point to manipulate his camera and other equipment to be able to function as a professional photographer." This was also inconsistent with Christopher's testimony wherein he outlined the numerous activities with which he was involved including taking pictures for Lightyear, teaching for CDIA, and operating the Hope Gallery. Brogna indicated that "there will be a slow and steady progression of central nervous system involvement manifested by greater physical impairments over time." Nowhere in his report, however, or in any of the medical records, did Brogna state that

Christopher will be unable to continue to work in any capacity in the future. (Trial Transcript 62:20 and 63:4.)

In January 2005, Brogna prescribed a trial of *Paxil* to treat Christopher's mild cognitive symptoms. Christopher testified that anti-depressants were prescribed "to help him cope with the emotional aspects," but he chose not to take them because he didn't like the side effects. Brogna has not prescribed any further medications for Christopher. Although Christopher uses a cane, it is not needed for walking but as a "point of reference of where the ground is..." The cane was not prescribed by a doctor, but was purchased by Shari during a vacation trip in New Hampshire. (Plaintif's exhibit A and Trial Transcript 86:7 and 71:2.)

Christopher sees Brogna only once per year and he has not been advised to take any kind of therapy, occupational or otherwise, except to "keep moving" and to stay "as active as possible". Christopher noted that at one time, after his diagnosis, he had been receiving counseling, provided free of charge by a friend, to "kind of deal with some of the emotional issues that [he] was dealing with." (Trial Transcript 90:18 and 91:18.)

At trial, Christopher testified that he has fears and concerns about his continuing ability to work in this profession in light of his MJD disease and the physical activity that is

needed to perform the various tasks associated with his businesses. Despite these concerns, Christopher has not applied for any jobs outside the field of photography. (Trial Transcript 114:1-115:5.)

Christopher has not even applied for easier jobs within the photography field. For example, he admitted that he is qualified to work as a photographer in a setting that is less physically demanding, such as portrait or department store studio work, but that he had not applied for such a position. He also recognized that if he did not have the equipment that such a less demanding job would require, the employer could provide it for him. With such a job, he would not incur the travel costs or the other expenses of his current businesses, and he conceded that he would be able to sell the $40,000 to $50,000 worth of equipment he now has on hand for approximately $25,000. (Trial Transcript at 115:6-21; 115: 11-116:2; 115:20-21; 117:7-17;116:3-116:13; 146:5-7.)

At one time, Christopher sought assistance from the Social Security Administration, however, at the time he was working more than 40 hours and earning more than $800 per week, and so did not meet the eligibility criteria. He testified that he had no interest in stopping work at the time, but was merely trying to find assistance to get him into some type of government sponsored

"disability insurance" or [healthcare] policy. (Trial Transcript 91:10 - 92:16).

He testified that up to that point "all of the legal advice" he had received in connection with his need for a healthcare plan led him to believe that he should not drop off the policy that he was on (Shari's COBRA policy that was carried over after she left Roger Williams University), because it would be "very difficult and expensive" for him to "get back in" [to a plan]. However, there was no evidence presented at trial to support his belief that his healthcare coverage would be impacted by his MJD diagnosis, other than Christopher's testimony, that was presented over the defendant's objection, that he "... was advised by [his] doctor and by the attorney that was looking into [his] disability that ... getting outside the system -- in other words, taking -- stopping this [COBRA] program and attempting to get outside the system and get another [healthcare] program -- was not a good idea." (Trial Transcript 94:14.) Indeed, Christopher testified that he did not have any overwhelming MJD related expenses impacting his insurance. (Trial Transcript 93:14).

**5. <u>THE SALE OF REAL PROPERTY AND STARTUP COSTS OF LIGHTYEAR IMAGING AND HOPE GALLERY</u>**

Shari testified that the decision to sell their interest in the property located at 724 Middle Road to Christopher's brother was made some time in 2002 shortly after Christopher was diagnosed with Type III MJD. Shari also testified that she

"doesn't remember" the sale price of the house, but that she just remembers paying off "whatever it was that [they] owed on the house and walking away with about $40,000."

Shari testified that she knew when they decided to sell their interest in the property, that she would not be rehired for her position at Roger Williams University[7]. She also testified that a portion of the $40,000 was used to pay off some bills and for "readjusting into the apartment", and the balance (one half to two-thirds of the proceeds) was invested into Lightyear. None of the $40,000 was used to reduce the Alvanas' student loans. (Trial Transcript 38:25-39:20.)

Lightyear had already been in existence when Christopher opened Hope Gallery in 2005, two months after filing the bankruptcy petition. Christopher presented evidence at trial indicating that Hope Gallery incurred "build out costs" of $3,180.94 (Plaintiff's Exhibit C "Hope Gallery Build Out Costs".)

It is not clear what other expenses were incurred in 2005 relating to Hope Gallery, however the income tax schedules indicate a significant jump from $5,761 for "other business property and supplies" in 2004 to $13,230 for the same expenses in 2005. (Exhibit D, Profit and Loss from business for the years 2004 and 2005.)

---

[7] The full-time visiting professor position began in September of 2002, and was renewable after three years, therefore, the position would not be ending until at least May 2005.

**6. THE ALVANAS' EXPENSES**

The Alvanas' testified that their current household expenses are as follows:

| | |
|---|---|
| Rent: | $400 |
| Food: | $587 |
| Electric: | $79 |
| Telephone: | $42 |
| Heat: | $110 |
| Internet/Cable: | $54 |
| Gasoline/Christopher: | $190 |
| Cash Spending: | $325 |
| Auto insurance: | $95 |
| Prescription medication: | $40 |
| Non-prescription pharmacy: | $52 |
| Spring Water: | $34 |
| Automobile Insurance: | $95 |
| Medical Insurance: | $1000 |
| Total: | $3,103 |

Although they itemized the above monthly expenses[8], Shari testified that the total monthly expenses were $3,392, resulting in a $289 unexplained expense. Shari indicated that the $400 rent expense is paid to her parents, and there are times when she does not pay and her parents forgive the debt.[9]

[8] The Alvanas' admitted to paying $200 per month for cell phone expense through the Lightyear business account which paid for one phone each for Christopher and Shari plus one phone for their daughter. They also acknowledged paying $34 per month for spring water (Id. at) and incurring a $70 expense to replace a remote starter for one of their automobiles. (Trial Transcript 119:23-120:5; 29:13-21; and 122:6-18.)

[9] The $400 per month rent would total $4,800 per year, but according to Christopher's testimony, the Alvanas' actually paid $3,200. (Trial Transcript 32:1.)

In addition, Christopher testified that at least a portion of the expenses that the Alvanas' list above, are actually paid by Lightyear and reported as business expenses. These items include household expenses of $1,200 and 3,800 for health insurance. (Trial Transcript 77:24 - 78:13 indicating that through November 17, 2006, Lightyear Imaging had paid $1,200 in household expense for the family and $3,800 for health insurance.)

The biggest monthly expense in the Alvanas family household is healthcare insurance. At the time of trial, the Alvanas' were covered under Shari's COBRA plan that went into effect when the three-year teaching position ended at Roger Williams University. Shari testified that at the time of trial, that expense was $1,000 per month and was increasing to $1,073 per month in January when the family switched over to a new "self-pay" option offered by the same provider. Since she is employed part-time and Christopher is self-employed, neither are eligible for any employment sponsored health plan. At trial, Shari testified that she knew that the monthly payments would increase slightly, but she "could not get a handle" on many of the other factors that go into the new plan including co-pays for doctor's visits and how the prescription plan would change. She testified that her annual deductible would increase from $200 to $400, but could not provide much else in the way of testimony as to how the increased

health-care costs would affect the household or business expenses. (Trial Transcript 11:4-12.)

Shari also testified that besides the health-care plan described above, she did not look into any other healthcare providers other than Rite-Care, which is a plan sponsored by the State of Rhode Island and offered to pregnant women. She testified that she did not look into other providers because they'd "been told that it would be very difficult because of Chris' condition to switch, that [they] should stay with Blue Cross because {they were] already in the plan because otherwise he becomes a high risk." She further testified that .... "even with switching over ...... because [she has] blood pressure and asthma and Chris [has] Machado Joseph disease that the price goes into, I guess, what they call a high risk category which brings us up to $1072," [versus $792 if both were completely healthy]. (Trial Transcript 30:19 - 31:16.)

**7. THE ALVANAS' STUDENT LOAN DEBT**

**a. Christopher Alvanas**

On August 26, 2003, Christopher signed a Federal Consolidation Loan Application and Promissory Note in the principal amount of $32,512 to consolidate the PLUS loans that he incurred for the education of his son, Dustin. On December 5, 2003, another PLUS loan in the amount of $5,485, was added to the

original consolidation debt. Interest accrues on the principal at the fixed rate of 4.25%.

From November 2003 until the filing of the bankruptcy petition, Christopher made 23 monthly payments in the total amount of $5,380.99. The monthly payment amount was $231.12, and the monthly payments were up to date as of September 22, 2005, a little less than one month prior to the bankruptcy filing and just two months prior to the opening of Hope Gallery. As of November 29, 2006, the total amount due on Christopher's student loan was $43,413, and consisted of $35,058 in principal and $8,354 in interest.

Since he consolidated his loans in August 2003, Christopher has never contacted his lender about any repayment alternatives, including graduated, extended, or income sensitive repayment plans. (Trial Transcript at 102:7-13.)

**b. Shari Alvanas**

On August 2, 2000, shortly after earning her Master of Fine Arts Degree, Shari signed a Federal Consolidation Loan Application and Promissory Note in the principal amount of $48,736.53, with a variable interest rate, to consolidate the loans that she had incurred to attend Vermont College Montpelier. (Exhibit US1.)

There are four repayment options for this type of loan. Shari chose the pay her student loans under the Extended

Repayment Plan in which she promised to make fixed monthly payments and repay the loan in 12 to 30 years. The monthly payment amount is set at a minimum of $50 per month or more, if necessary, to repay the loan within the required time period. The amount of payments may be adjusted under the plan to reflect changes in the variable interest rate. (Exhibit US 4.)

Other payment options offered are: the Standard Repayment Plan, which calls for fixed monthly payments, and a repayment period of 10 years; the Graduated Repayment Plan, which calls for low initial payments that increase every two years, and a repayment period of 2 to 30 years; and the Income Contingent Repayment Plan, which is based upon the total amount of the loan, family size, and the borrower's household adjusted gross income. Under this plan, as income changes, the repayment amount may also change, and any amount not repaid after 25 years is forgiven. (Exhibit US 4.)

Shari testified that she chose the Extended Repayment Plan over the Income Contingent Repayment Plan because, at the time, her income was "healthy enough", and she wanted to have her loan paid off before her daughter went to college so that they would not be handling three loans at the same time (hers, her daughter's, and her son's PLUS loan). (Trial Transcript 44).

Shari's monthly payment amount under the Extended Repayment Plan was set at $411.80 per month. Shari was granted a deferment

from December 2000 until March 2003 after which interest was capitalized, and she made her first payment in May, 2003. Between May 2003 and September, 21, 2005, just one month prior to filing bankruptcy, Shari made 24 monthly payments, totaling $11,935.80. The payment amounts were usually $411.80, but on three occasions she paid $823.20, and on one occasion, she paid $1,234.80. As of December 29, 2005, the total amount due was $51,328.65. (Exhibit US 1.)

Shari testified that she was unfamiliar with the Income Contingent Repayment Plan despite having checked off the Extended Repayment Plan option and signed the repayment plan selection, which specifically stated that she had read, understood, and agreed to the terms and conditions of the note including the Borrower's Certification and Authorization printed on the reverse side and the accompanying Borrower's Rights and Responsibilities, which explains the various repayment terms, including deferment, forebearance, and the specific details of each repayment option. The Borrower's Rights and Responsibilities also outlines the special repayment arrangement for full-time teachers. (Trial Transcript 43:21 - 22 and Exhibit US 3.)

Had she chosen the Income Contingent Repayment plan, her payments would have been based on the total amount of the loan, her family size, and her adjusted gross household income (based

upon information that Department of Education would have obtained from the Internal Revenue Service ("IRS")).[10] (Exhibit US 4.)

## II. ARGUMENT

### A. The plaintiff-debtors, now, and in the foreseeable future, are able to maintain a reasonable, minimal standard of living for the plaintiff-debtors and the plaintiff-debtors' dependants and still make payments on the plaintiff-debtors' student loans.

Pursuant to 11 U.S.C. § 523(a)(8), a debt for an educational loan is not dischargeable in bankruptcy unless the debtor can establish by a preponderance of the evidence that excepting the debt from discharge will cause the debtor and his/her dependents undue hardship. Smith v. Educ. Credit Mgmt. Corp. (In re Smith), 328 B.R. 605, 610-611 (B.A.P. 1st Cir. 2005).

By giving additional protections against the discharge of student loan debt, it appears that the Bankruptcy Code's general purpose of giving debtors a fresh start does not apply automatically to student loan debtors - the interest in ensuring the continued viability of the student loan program takes precedence. Nash v. Conn. Student Loan Foundation et. al (In Re Nash), 446 F.3d 188, 191 (1st Cir. 2006). Accordingly, the hardship alleged by the debtor "must be undue and attributable to truly exceptional circumstances, such as illness or the existence

[10]Until the income information was obtained from IRS, her payment amount would have been limited to the accrued interest unless she requested a forebearance.

of an unusually large number of dependents." TI Federal Credit Union v. DelBonis, 72 F.3d 921, 927 (1st Cir. 1995). See also Burkhead v. Educ. Credit Mgmt. Corp. (In re Burkhead), 304 B.R. 560, 565 (Bankr. D. Mass. 2004) (stating that "undue hardship requires more than the usual 'garden variety' hardship"); United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1111 (9th Cir. 1998). Mere financial adversity is insufficient, "... there must be additional unique circumstances..", In re Bourque, 305 B.R. 548, 551 (Bankr. D. Mass. 2003). Additional circumstances "encompass" circumstances that impacted on the debtor's future earning potential but which [were] either not present when the debtor applied for the loans or [have] since been exacerbated, U.S. Dept. of Ed. V. Gerhardt (In re Gerhardt), 348 F.3d 89, 92 (5th Cir. 2003).

Several tests have been used by the courts to evaluate undue hardship claims made under 11 U.S.C. § 523(a)(8). The two most prevalent tests are the "Brunner test" and the "totality of the circumstances" test. Although the Court of Appeals for the First Circuit has declined to adopt a test for determining undue hardship, Nash at 191, many courts within the First Circuit including the Bankruptcy Court for the District of Rhode Island, have adopted the totality of the circumstances test. In Re Phelps, 237 B.R. 527 at 535 (Bankr. D. RI. 1999).

Under the totality of the circumstances test, the debtor's burden is to prove by a preponderance of the evidence that now, and in the foreseeable future, she will not be able to "maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans..." Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks), 331 B.R. 18, 31 (Bankr. D. Mass. 2005). In making this determination, the court reviews factors such as the debtor's past, present and reasonably reliable future financial resources and the debtor's reasonable necessary living expenses. Hicks, 331 B.R. at 31.

An undue hardship analysis must necessarily look to the debtor's salary and her earning capacity during the repayment period. The debtor has the burden to demonstrate that she has truly maximized her income in an attempt to pay her student loans. See Clark v. Educ. Credit Mgmt. Corp., 273 B.R. 207, 210 (Bankr. N.D. Iowa 2002) ("[Debtor] has not shown that he has done everything possible to maximize income . . . ."). A debtor "cannot voluntarily reduce his income and then seek a discharge of his student loan debt as an undue hardship." Block v. United States Dep't of Educ., 273 B.R. 600, 605 (Bankr. W.D. Mo. 2002) (debtor with bachelor's degrees and masters degree has "apparently unlimited opportunities" to earn more money in the future than he is earning today). Thus, the relevant question is

not what the debtor "plans to make in the future; the question is what the debtor is capable of earning." _Rose v. United States Dep't of Educ._, 227 B.R. 518, 525 (Bankr. W.D. Mo. 1998), _aff'd in part, remanded in part_, 187 F.3d 926 (8th Cir. 1999). The debtor must offer evidence that proves her claimed earning capacity. *Id.*

Courts in undue hardship cases are not limited to looking solely at current income, but instead can regularly require debtors to repay debts if they have the potential to earn more in the future than they do at present.

The Alvanas' claim that they are unable to earn an income sufficient to meet their reasonable expenses, without including either debtor's student loan debt. However, even if the Alvanas' income ($3,700) and expense ($3,392[11]) calculations are taken at face value, they are still left with a $300 per month surplus. (Trial Transcript 38:9; 159:3.)

The Alvanas' also claim that the potential for increasing their income is limited by Christopher's medical condition. Although the Alavanas' did not make any disability claims as to Shari, the Bankruptcy Court[12], in discharging the Alvanas' student

---

[11] This includes $289 in expenses which are unaccounted for.

[12] The Bankruptcy Judge rendered his decision immediately after trial without allowing closing arguments.

loan debts in full, found both of the Alvanas' to be "disabled[13]" and incapable of increasing their income, making the existence of these "disabilities" alone a *per se* undue hardship.

Shari is an intelligent, academically successful individual who is currently employed part time as a creative writing instructor at University of Massachusetts at Dartmouth. She continues to seek full time employment in her chosen profession. The Bankruptcy Judge improperly characterized Shari's chosen profession as a "disability" instead of acknowledging that she is an individual with an advanced degree with the potential to earn income that is substantially greater than her present earnings by obtaining a full time position and/or authoring and publishing a book on poetry.

The Bankruptcy Judge also miscalculated the Alvanas' current income. In the income/expense category of Christopher's business, the Court calculated the Alvanas' monthly income by including $8,000 in one-time capital expenses for the purchase of new equipment for Lightyear, rather than dividing that expense over the expected lifetime of the equipment. Moreover, if the Alvanas' financial situation was as dire as they claimed, they

[13] Although Shari did not claim to be disabled, the court found that she was disabled in that "she is a poetry teacher" and that "she painted herself into a pretty narrow...way of earning a living". The judge added that he "didn't think she would succeed in lines of work that are not pretty close [to what she's studied for]." (Trial Transcript 154:11)

would not have had the ability to spend $8,000 for new camera and computer equipment. This expenditure is also inconsistent with the testimony regarding the expected deterioration in Christopher's physical condition. The Court failed to consider that Christopher admitted that both businesses are in their start-up phase with expenses likely to decline as capital expenses are reduced and income likely to increase as the businesses become better established. (Trial Transcript 104:3.)

The Bankruptcy Judge also failed to add the value of the Alvanas' income tax refunds to the monthly income, which would have increased the family's income by at least $211 per month.

The Court also failed to consider whether the family's expenses were excessive, despite the fact that the expenses include $587 per month for food costs for a family of three; $200 for cell phones for the family; and $34 per month for bottled water. (The Alvanas' also saw fit to incur other questionable, luxurious, expenses in spite of their alleged financial hardship - such as $70 for a remote car starter). Additionally, the Court failed to give weight to the fact that the Alvanas' claimed household expenses are actually paid, at least in part, by Lightyear and that their other household expenses are likely to decrease in the near future, as their dependent child is a teenager and only a couple of years from leaving the household.

The Court also failed to address the fact that the Alvanas' have several sources of income, and are seeking to increase their income. Also, despite his claims that MJD effects his ability to work, Christopher is actively employed in his chosen field. He owns two separate businesses. He earns additional income from teaching in classrooms as well in informal settings, even traveling overnight to do so. He earns income by traveling on treks where he guides aspiring amateur photographers seeking to capture images in sometimes hostile environments, capitalizing on his experience as an accomplished professional photographer. Indeed, Christopher testified that he is currently involved in numerous income producing activities in his chosen field. He is so active in fact, that in his own words, he has not had much rest.

Additionally, the Court failed to consider alternative employment options available to Christopher that he has not pursued or even examined. Christopher testified that he did not apply for higher paying positions outside of the field of photography. Perhaps more importantly, while Christopher admitted that he is qualified to do work in the field of photography that would better suit his medical condition -- namely, studio work -- he has done nothing to pursue this line of work. If Christopher were to obtain such a position, this would have a substantial positive affect on the family's income and

expense equation as the expenses of operating the two businesses would be eliminated. Moreover, such an employment change would allow Christopher to sell his business related equipment and realize an immediate cash inflow of $25,000. Having not pursued these options, it can hardly be said that Christopher is at the end of his financial rope such that repaying his student loan debt would cause an undue hardship.

The Court also failed to address the fact that neither debtor sought an administrative discharge, or alternative repayment plans for their student loan debt prior to seeking discharge. The only remedy sought, other than the brief deferments requested by Shari, in order to manage their student loan debt was total discharge through the bankruptcy court.

In short, the Alvanas' failed to prove by a preponderance of the evidence that now, and in the foreseeable future, they will not be able to "maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans." Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks), 331 B.R. 18, 31 (Bankr. D. Mass. 2005).

**B. The bankruptcy Court improperly admitted and considered as evidence lay testimony regarding the medical condition of individuals related to the plaintiff-debtor, Christopher Alvanas.**

"A debtor seeking discharge based on a medical condition, must prove that the condition will prevent [him or] her from

earning sufficient income to repay the debt even if she participates in an equitable contingent plan like the Ford Program." *See* Burkhead, 304 B.R. at 566.

In the instant case, the court improperly admitted lay opinion evidence of the medical condition of Christopher's father and used that information to predict the future course of Christopher's illness without establishing that the father has the same type of MJD as the son. FED.R.EVID. 701 provides as follows:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness testimony or the determination of a fact in issue and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

While Christopher has the mildest form of MJD, Type III, there was no evidence as to the form or type of MJD with which his father was afflicted. Even if there was evidence as to the type of MJD, there was no evidence as to any other ailments with which his father may have been afflicted. Moreover, in his own testimony, Christopher indicated very minor limitations associated with MJD as he was still able to engage in such activities as photographing polo matches, and going on photography "treks" to New York City and even Arches National Park. Indeed, Christopher testified that his "therapy" is pretty

much staying as active as possible. There was no evidence presented as to any treatments that his father may have received.

The Bankruptcy Court expressly conceded that the medical evidence included a good deal of hearsay that might ordinarily have been inadmissible, since the parties agreed to allow the introduction of a medical report by Christopher's treating physician who was unable to appear[14] as an expert witness. Nonetheless, the Court ignored evidence that Christopher has the mildest, and slowest progressing, Type III MJD.

The Court's summation of the debtor's medical condition was based upon "anecdotal evidence" provided by lay witness Shari Alvanas, in connection with her impressions of Christopher's father and his uncle and others and how those impressions related to her speculation as to the level of care that Christopher might need some time in the future[15]. No expert testimony was offered at trial as to either the expected progression of Christopher's symptoms, or as to the specific type of MJD that either

---

[14] The defendants learned, just days before trial, that Brogna, Christopher's treating physician, who had been listed as an expert witness on the joint pretrial order, could not appear at trial as expected because he was undergoing chemotherapy for treatment of lung cancer.

[15] The Court dealt with the defendants' objections to this testimony by finding that the cross examination would determine the weight that was given to the testimony and also it's admissibility. The Bankruptcy Judge indicated that he would "kind of leave that open, but let it in for now." The Court, however, never again addressed the defendants' objections.

Christopher's father or uncle was diagnosed with, whether they are afflicted by additional, unrelated, conditions, or the symptoms that neither have exhibited. See Nash at 193. (the testimony of the student loan debtor as to the future was "necessarily speculative" in the absence of a prognosis from treating physicians or other experts). Indeed, based upon testimony and evidence presented as to the age of onset, and medical evidence presented in the form of a report, Christopher's father was diagnosed with a more severe and faster progressing form of the disease.

In the absence of evidence of the progression of the disease and in light of the substantial functions in the photography field that Christopher is still able to perform, the Bankruptcy Court was premature in finding Christopher disabled and, therefore, in finding that the re-payment of the Alvanas' student loans would constitute an undue hardship.

## III. CONCLUSION

Since the plaintiff-debtors, Christopher and Shari Alvanas, now, and in the foreseeable future, will be able to maintain a reasonable, minimal standard of living for the plaintiff-debtors and the plaintiff-debtors' dependants and still be able to make payments on the plaintiff-debtors' student loans; and since the Bankruptcy Court improperly admitted and considered as evidence lay testimony regarding the medical condition of individuals

related to the plaintiff-debtor, Christopher Alvanas; the decision of the Bankruptcy Court finding that the re-payment by the plaintiff-debtors of their student loans would constitute an undue hardship and that, therefore, said loans are discharged, should be reversed.

Respectfully submitted,

UNITED STATES DEPARTMENT OF EDUCATION,
Defendant-Appellant

By its attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Michael P. Iannotti
MICHAEL P. IANNOTTI, #2919
Assistant U.S. Attorney
United States Attorney's Office
Fleet Center
50 Kennedy Plaza, 8th floor
Providence, RI 02903
401/709-5000
401/709-5017 (fax)
Email: michael.iannotti@usdoj.gov

COLLEGE ACCESS NETWORK,
Defendant-Appellant

By its attorneys,

/s/ Kyle Seedorf

Kyle Seedorf, appearing pro hac vice
College Access Network
1801 Broadway, Suite 360
Denver, CO 80202
(720) 264-8530
Fax: (303) 292-1606
Email: kseedorf@cslp.org

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of March, 2007, I electronically filed the within Brief for the Defendant-Appellants with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System. The following participant has received notice electronically:

Thomas B. Orr, Esq.
55 Memorial Boulevard
Newport, Rhode Island 02840
Email: laworr@verizon.net

/s/ Michael P. Iannotti
MICHAEL P. IANNOTTI