**DISTRICT COURT OF THE UNITED STATES**

**FOR THE DISTRICT OF RHODE ISLAND**

**United States Department of Education, et al**

**v.** **CA#07-24ML**

**Christopher M. Alvanas, et al.**

# APPELLEES' REPLY MEMORANDUM

**Chris' Work History:**

After reading the Appellants' brief regarding the Appellee Christopher M. Alvanas' abilities, even I wondered why Chris wasn't wealthy. But, further reading of the transcripts shows that selective editing can work wonders.

Appellants state in their brief that Chris opened Lightyear in 2002 "capitalizing on his 25 plus years as a professional photographer" Brief Of Appellants (BOA), Pg. 8-9. In reality, Chris has been a professional photographer "...for six years now, but I've been a photographer of sorts for 20 years." Tr. Pg. 66, Lines 18-19. They further state that he "...takes photos of various sporting events such as soccer and polo." BOA Pg. 9. The reality check is that Chris doesn't shoot soccer games or kids' sporting events regularly because of the cost, time, releases, etc. TR. Pg. 108-109. He also shoots the local polo games in Portsmouth, but not for pay. Id., 109.

The Appellants characterize the gross revenues of Lightyear in 2003 and 2004 as "Christopher's average gross annual income…" BOA Pg. 9. These are two separate categories and need to be kept that way.

The new instructional DVD that the Appellants refer to on Pg. 11 of their brief has sold eight copies as of the trial date, at $40.00 per copy and Chris received $20.00 per copy, for a grand total of $160.00. Tr. Pg. 148-149, Lines 16-25 & 1-7.

The concept of stock photos seemed to intrigue the Appellants as a lucrative source of income for Chris, but the reality is that he has realized little or no income from that venture. He currently is repaying a $4,000.00 advance from one stock house (Tr. Pg. 149-150, Lines 9-25 & 1-18), and to provide the proper photographic medium for the stock houses, he had to purchase a new, expensive camera. That camera was purchased with a loan from a family member. Tr. Pg .116-117, Lines 19-25 & 1. While it may be some type of revenue stream in the future, for now it is a net loss.

What about these "photo treks"? Chris' actual testimony differs from the summary provided by the Appellants. He states that while he has accepted the job for the spring, he has not decided if he will actually do it. They need the money, but it is a hostile environment. "I've accepted the job, and that's as far as I've taken it. I am a bit nervous (about) it, but I'm not sure I have much of a choice." Tr. Pg. 70, Lines 3-10. He was nervous because of his MJD and the site's elevation and rough terrain. Id, Lines 17-18. There is no testimony on any other future treks.

The Appellants make quite a jump with their statement that "Christopher should be able to realize more income from Hope Gallery in 2007. Lightyear's income should also increase substantially…" Hope Gallery is not a profit center, but rather a source with

which artists, including Chris, can place their work before the public. Due to the way it is set up, any profits that it might generate in the future will be minimal.

**Chris' Machado Josephs Disease –**

As the Bankruptcy Court so aptly put it, this is the "800 pound gorilla" in this case. The Appellant would lead this Court to believe that Chris' condition is mild and does not really affect his ability to function in the workplace. This conceit allows the Appellant to argue that future income can see a substantial increase.

Again, the reality of the matter is quite different. Dr. Bronga stated in his written report that "Over the last four years Chris' condition has progressed. His principal manifestations of MJD are 1) gait ataxia…2) increasing difficulty with arm, hand and finger mobility…" Tr. Pg. 62. The Doctor goes on to talk about Chris' difficulty in manipulating small objects, using a computer keyboard or mouse, and using his photographic equipment. Id.

Dr. Brogna's written report concludes:

> "In conclusion, MJD is a progressive, degenerative, neurological disease. Mr. Alvanas' present manifestations of MJD are not expected to improve or stabilize. There will be a slow and steady progression of central nervous involvement manifested by greater physical impairments over time." Tr. Pg. 63, Lines 2-6.

Chris testifies to all of these symptoms and their adverse effect on his profession and his search for other employment. (Loss of motor skills – Tr. Pg. 68; balance issues – Pg. 70 & 97; walking – Pg. 70-71; other employment – Pg. 72-73 & 97-98; vision issues – Pg. 95; numbness in hands – Pg. 96). What Chris has found is that no employer is going

to bring on a new employee, with a full benefit package, who has such a pre-existing condition as Chris. Such a move would raise the employer's health care costs. If Chris hid his condition, as he has so far from the trek employers, he could be putting himself or other employees at risk. Unless the medical community develops a "magic bullet" cure for MJD in the near future, the adverse effects to which Chris testified will only increase over time, not decrease. The Bankruptcy Court understood that.

**The Alvanas Expenses:**

The Appellants have most of the Alvanas' expenses correct, but made a significant error regarding automobile expenses, what they labeled as "Gasoline/Christopher - $190.00" BOA Pg. 22. Shari testified that their cost to run their cars was closer to $325.00 a month. Chris used the gas card for $190.00 a month, but she tended to shop around and pay cash. Tr. Pg. 16, Lines 2-7. This alone increases the Alvanas expenses from $3,103 (Appellants' figure) to $3,238, a figure closer to that of $3,392.00, as accepted by the Bankruptcy Court. This figure does not even begin to figure in repairs, the last which cost $2,500.00 Tr. Pg. 15, Line 20. Average that figure over 12 months and you have another $200.00 per month expense, for a total of $3,538.00. This is a more realistic figure, as both of the Alvanas' cars are getting older and they can expect similar repair bills in the future.

The Appellants also question the Alvanas' budget item labeled "Food - $587.00". They state that it is excessive, but don't have a "non-excessive" figure to put into the equation. Shari testified that that figure was not just for food, but for groceries (anything you would purchase in a super market), including food for the family's two dogs and number of cats. Tr. Pg. 13, Lines 3-10.

On what luxuries do the Alvanas' spend the Appellants' money? They buy bottled water at $34.00 a month! They spent $70.00 once to fix a remote car starter! Shari gets her hair done every month and a half for $42.00! What "...other questionable, luxurious expenses..."(BOA, Pg. 33) do the Alvanas' have? If they existed, the Court can be sure that the Appellants would have listed them.

**The Alvanas' Income.**

This figure seems slippery to the Appellants. They kept using the monthly income of $3,700.00 during trial and in their brief. BOA Pg. 31. The correct figure is $2,444.04. This is arrived at by taking Shari's take home pay of $997.02 (as shown on her pay stub from UMass-Dartmouth, introduced into evidence by the Appellants), multiplying it by 2 and adding Chris' average monthly contribution of $450.00. The Bankruptcy Court was able to understand the difference between gross income and take home pay (Tr. Pg. 38, Line 18), why can't the Appellants? Chris' average monthly income was arrived at by taking the $5,000.00 that Lightyear paid for family expenses in 2006 and dividing it by 11 months. Tr. Pg. 79, Lines 6-11.

So what we have is income of $2,444.04 and expenses of $3,392.00. What about the tax return. For each year on record, the Appellees' tax return has been smaller than the year before. Each year, Appellees' income has been smaller that the year before. The 2005 return was $2,627.00. That is equal to an additional $219.00 per month on the income side. That reduces the monthly shortfall by about 15%, but does not eliminate it. (See car repairs in Expenses). Even adding the possibility of a 2006 refund similar to 2005, the average monthly income is now $2,663.04, still $728.93 in the red.

Further, there is another fact that the Appellants have failed to take into consideration: semester breaks and summer vacation. Shari testified that she does not get paid during these periods and has to apply for unemployment insurance, but only receives it if she does not have the same job the next semester. Tr. Pg. 6-8. Her last unemployment check was for the summer of 2006, did not come until the middle of August and was for $3,609.00. Id, Pg. 6. This is for three months, or six pay periods, and averages $601.50 per pay period. This is less than half of her gross income from UMass-Dartmouth. Shari also testified that she won't receive any unemployment during winter break 2006-2007 if she gets rehired at UMass (which has occurred.)

Thus, for at least one month, Shari has no income. For three months in 2006 her monthly gross income was $1,203.00 and for the remainder of the year (eight months) her take home income was $15,952.64 (1,994.04 x 8). This makes Shari's yearly take home income $19,561.64 at best, or $1,630.14 per month. Add Chris' 2006 contribution of $450.00 per month and the assumed income tax return of $219.00 per month, and the real monthly income of the Alvanas family is $2,299.14. Balance that against either the Appellants' expense figure of $3,103.00, the Appellees' figure of $3,392.00, or the more realistic figure of $3,528.00 and there is a serious shortfall amount from $800.00 to $1,098.00 to $1,234.00 every month of the Alvanas' year. This is the reality that the Appellees live with every day.

**Future Earnings** –

Appellants have the luxury of supposing that everything will come to fruition, all of Chris' "chickens will come home to roost" or that Shari will find that dream job locally. The Appellees don't have that luxury. They have to deal with the mean realities of the

present. The Appellants want the Court to believe the Alvanas' could see an increase in income of more than the $10,000.00 to $14,800.00 a year necessary to allow them to break even. The reality of the "how" isn't important to the Appellants, just the "might" seems good enough. To make the loan repayments discussed in Appellants brief, the Alvanas' income would have to increase their incomes by at least $12,000.00 to $16,000.00 next year. That is a one year increase in the 50 to 60% range! Given the current economy, the cutbacks in state college funding, and Chris' medical condition, how realistic are the Appellants' expectations?

**Shari's Prospects –**

Yes, Shari is a highly educated, intelligent woman, who has proven her ability to fill decent paying positions at the college level. But, she has hit the "publish or perish" roadblock that confronts most college teachers. One has to publish a book to get ahead, but in the poetry discipline, you must win a writing contest to get published; "vanity" publishing is discouraged in the profession. Although Shari has entered these contests, she has yet to win. Tr. Pg. 53-54, Lines 9-25 & 1-5.

Shari has applied for over two hundred different positions over the last two years. She has applied for various level college teaching positions, all over the country, entry level receptionist jobs, training positions and store clerk. None of these applications have borne fruit. Tr. Pg. 9, Lines 1-7. Obviously, Shari is too educated for some positions (clerk/receptionist), too qualified for others (trainer), and not qualified enough for the rest.

**Argument –**

"Hardship alleged by the debtor 'must be undue and attributable to truly exceptional circumstances, such as illness'" BOA, Pg. 28. "'(U)ndue hardship requires more than the usual garden variety hardship'" Id. Pg. 29. "'...there must be additional unique circumstances..." Id. "Additional circumstances encompass circumstances that impacted on the debtor's future earning potential but which (were) either not present when the debtor applied for the loans or (have) since been exacerbated." Id.

The above quotes sound like they were written about the instant case. The undue burden that repaying these loans would place upon the debtors is immense and patently obvious. The hardship is the "800 pound gorilla"!

The Appellants do not understand that Shari has a "disability" other than her inability to find higher paying or more secure employment. The disability is that she is going to have to spend more time in the future caring for Chris, as the MJD progresses (Tr. Pg. 21-23) or obtain higher paying employment to cover the loss of income as Chris earns less and the added expense of paying someone to care for Chris as she works. Her disability **is** Chris' disability.

There was more than judicial economy in hearing these cases together. What negatively affects Chris, negatively affects Shari and visa versa. These two cases are really one. No matter how much time is spent trying to present Shari as a case separate from Chris, they are so inextricably entwined that it cannot be done. Shari could receive that "apparently unlimited" opportunity to earn more money in the future, but will it ever be enough to both cover the family expenses and pay back the student loan obligations?

Chris certainly will not be able to do so. All of various endeavors that he has tried over the last few years are to find a way to earn money to help support his family. Given the MJD and its steady progression, he will never be able to do all or many of these things at the same time. While any one of the "profit centers" (fashion shoots, instructional DVD's, photo treks, teaching, etc.) could prove successful, no single one by itself will relieve this family of the undue burden.

**Bankruptcy Court Mistakes –**

The Bankruptcy Court did not miscalculate the Alvanas' income, as the majority of the money used to buy the new equipment came from a family loan.

The Court did not fail to consider the future capacity of the businesses, because it considered them in light of Chris' MJD.

While the Court may have not considered the income tax return into the Alvanas' monthly income, it did so because $219.00 does not make much of a dent in a "$1,000 shortfall monthly".

The Court did not considered the family's expenses to be excessive. The cell phones were not even in the family expenses. BOA, Pg. 22. The bottled water and the hairdresser were considered by the Court and determined not to be luxuries by any standard. Tr. Pg. 157. There were no "…other questionable, luxurious, expenses…" (BOA, Pg. 33) for the Court to reflect upon.

The Court understood and considered the contributions of Lightyear to the family expenses. It understood that Chris' $450.00 a month contribution to the family income was in fact $1,200.00 of rent and $3,800.00 of medical insurance payment that Lightyear made when the household couldn't afford same ($5,000.00/11= $450.00.)

The Court did not fail to address the Alvanas' several sources of income and their attempts to increase same. The Court discussed the debtor's attempts to make more money and to get better jobs, and the limitations on such endeavors. Tr. Pg. 156-158.

The Court did not fail to consider other jobs that Chris might get. The Court understood the limitation that having MJD puts on a person's employment opportunities. Tr. Pg. 153-154. The Appellants' "ifs" are abundant, more so than the jobs available to Chris. What is more "rose-colored" than stating that by getting a better paying job outside of photography "...the expenses of operating the two businesses would be eliminated." and "...Christopher (could) sell his business related equipment and realize an immediate cash inflow of $25,000." BOA Pg. 35.

**Improperly Admitted Testimony –**

With the unavailability of Dr. Brogna, the parties agreed to have his report and an attachment read into the record. The parties also stipulated that Chris had Type III MJD. Shari's testimony was admissible because it was her opinions that were "(a) rationally based on perception of the witness, (and) (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue..." FED.R. EVID. 702.

The Court had reviewed the file prior to hearing. It had read the Doctor's report and attachments. The Doctor was unavailable to testify. The Appellants' agreed to go forward without the Doctor's live testimony and the inability to cross-examine him. The Appellants had no expert witness to assist the Court. It offered no learned treatises on MJD of which the Court could take judicial notice. The Appellants did nothing at the hearing to make the argument they offer here.

The Bankruptcy Court made a finding based upon all of the evidence before it. It was free to decide, if it so choose, that the evidence contradicted the stipulation on Type III. It was free to admit Shari's and Chris' lay testimony under Rule 701 (a) & (b). The Appellant can't fail to put on a case and then complain about it on appeal.

Finally, the Appellants did not raise their objection again at the end of the hearing, as the Court told them they could. Tr. Pg. 21, Lines 22-25. The Appellants did not renew their objection when the Court gave them the second opportunity to do so after its bench decision. Tr. Pg. 158-159.

**Conclusion –**

Since the Bankruptcy Court made no "clearly erroneous" findings of fact; since it understood the symbiotic relationship between the two cases; since it properly applied its facts to the three prongs of the "totality of circumstances" test; since the various possibilities offered by the Appellants of increasing the debtors' income are of the speculative variety; since even with a recalculation of the debtors' income and expenses, they now and in the foreseeable future, **will not** be able to maintain a **reasonable**, minimal standard of living for themselves and their dependants and still be able to make payments on their student loan obligations; and, since the Court did not improperly admit and consider the lay testimony of either Shari Alvanas or Christopher Alvanas; the decision of the Bankruptcy Court finding that the re-payment by the Alvanas' of their student loans would constitute an undue hardship and that, therefore said loans are discharged, should be affirmed.

Respectfully Submitted.
Christopher M. Alvanas and

Shari A. Alvanas, by their attorney

/s/ Thomas B. Orr .

Thomas B. Orr, Esq. #2851
55 Memorial Blvd.
Newport, RI 02840
846-4610
849-9859 fax

**CERTIFICATION OF SERVICE**

I hereby certify that on the 29th day of March, 2007, I electronically filed the within Reply Brief for the Plaintiffs-Appellees with the Clerk of the US District Court for the District of Rhode Island using the CM/ECF System. The following participants have received notice electronically: Kyle Seedorf, Esq. and Michael PO. Iannotti, Esq.

/s/ Thomas B. Orr